Docket No. 100123.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

MARTHA GILLMORE, Ex'r of the Estate of Mary Fillbright, Deceased, Appellant, v. THE ILLINOIS DEPARTMENT OF HUMAN SERVICES, Appellee.

*Opinion filed January 20, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, McMorrow, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

## OPINION

The plaintiff, Martha Gillmore, as the executrix of Mary Fillbright's estate, appeals the decision of the appellate court (354 Ill. App. 3d 497) affirming the decision of the circuit court of Menard County in turn confirming the administrative decision of the Illinois Department of Human Services (DHS). The DHS found Fillbright eligible for Medicaid, but imposed a 22-month penalty period because Fillbright had purchased a so-called "balloon" annuity that the DHS considered an improper transfer of assets pursuant to a state regulation. For the reasons that follow, we affirm.

## BACKGROUND

In 1965, Congress enacted Title XIX of the Social Security Act, commonly known as the Medicaid Act. See 42 U.S.C. §1396 *et seq.* (2000). This statute created a cooperative program in which the federal government reimburses state governments for a portion of the costs to provide medical assistance to two low income groups: the categorically needy and the medically needy. The categorically needy are persons who are automatically eligible to receive cash grants under one of the general welfare programs–the Aid to Families with Dependent Children program (AFDC) (42 U.S.C. §601 *et seq.* (2000)) or the Supplemental Security Income for the Aged, Blind, or Disabled program (SSI) (42 U.S.C. §1381 *et seq.* (2000)). See 305 ILCS 5/5–2(1) (West 2002); 42 C.F.R. §435.100 *et seq.* (2003). The medically needy are persons who are ineligible to receive cash grants under AFDC or SSI because their resources exceed the eligibility threshold for those programs, but who still lack the ability to pay for medical assistance. See 305 ILCS 5/5–2(2) (West 2002); 42 C.F.R. §435.300 *et seq.* (2003). People who fall into the second category are called MANG (Medical Assistance–No Grant) recipients. See 89 Ill. Adm. Code §120.10(a) (Conway-Greene CD-ROM March 2002). To qualify for Medicaid as a MANG recipient, a person must have low income and low assets, and the person must "spend down" any resources over the statutory and regulatory limits. See 89 Ill. Adm. Code §120.10(d) (Conway-Greene CD-ROM March 2002).

States that choose to participate in the Medicaid program design their own plans and set reasonable standards for eligibility and assistance. See 42 U.S.C. §1396a(a)(17) (2000). States must comply with certain broad requirements imposed by federal statutes and regulations issued by the United States Department of Health and Human Services, which oversees the Medicaid program through the Health Care Financing Administration (HCFA), now called the Centers for Medicaid and Medicare Services. See *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37, 69 L. Ed. 2d 460, 465, 101 S. Ct. 2633, 2636 (1981); *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11, 15 (3d Cir. 1989) (Medicaid " 'is basically administered by each state within certain broad requirements and guidelines' "). Each state also must designate a single agency to administer its Medicaid plan, though another agency may make eligibility determinations. See 42 U.S.C. §1396a(a)(5) (2000); see also 42 C.F.R. §431.10(a) (2003).

In Illinois, the Medicaid agency is the Department of Public Aid (DPA). See 305 ILCS 5/2−12(3) (West 2002); *American Society of Consultant Pharmacists v. Garner*, 180 F. Supp. 2d 953, 958 (N.D. Ill. 2001). The DHS makes eligibility determinations in accord with DPA regulations. See 305 ILCS 5/5−4 (West 2002).

In 1993, Congress sought to combat the rapidly increasing costs of Medicaid by enacting statutory provisions to ensure that persons who could pay for their own care did not receive assistance. Congress mandated that, in determining Medicaid eligibility, a state must "look-back" into a three- or five-year period, depending on the asset, before a person applied for assistance to determine if the person made any transfers solely to become eligible for Medicaid. See 42 U.S.C. §1396p(c)(1)(B) (2000). If the person disposed of assets for less than fair market value during the look-back period, the person is ineligible for medical assistance for a statutory penalty period based on the value of the assets transferred. See 42 U.S.C. §1396p(c)(1)(A) (2000). Congress also mandated that a state plan for medical assistance must comply with, *inter alia*, the provisions of section 1396p with respect to "transfers of assets[ ] and treatment of certain trusts." 42 U.S.C. §1396a(a)(18) (2000). If the person establishes a trust during the look-back period, any portion of such a trust from which no payments could be made to the person shall be considered assets disposed of by that person. See 42 U.S.C. §1396p(d)(3)(B)(ii) (2000). That is, any assets disposed of during the look-back period are "countable" toward Medicaid limits and subject to the spend-down requirement, if the person's resources are over those limits. The term "trust" includes an annuity "only to such extent and in such manner as the Secretary [of Health and Human Services] specifies." 42 U.S.C. §1396p(d)(6) (2000).

In November 1994, the HCFA did just that in a policy document known as Transmittal 64. State Medicaid Manual, Health Care Financing Administration Pub. No. 45−3, Transmittal 64, §3258.9(B) (November 1994). Transmittal 64 provided guidelines for state Medicaid caseworkers on how to evaluate the transfer of assets into trusts and annuities. An annuity is a contract in which a person pays a bank or an insurance company a lump sum in return for fixed periodic payments. If the person dies during the term of the annuity, the remainder is typically converted into a lump sum and paid to a designated beneficiary. See State Medicaid Manual, Health Care

Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994); see generally Black's Law Dictionary 99 (8th ed. 2004). According to the HCFA:

> "Annuities, although usually purchased in order to provide a source of income for retirement, are occasionally used to shelter assets so that individuals purchasing them can become eligible for Medicaid. In order to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets, a determination must be made with regard to the ultimate purpose of the annuity (i.e., whether the purchase of the annuity constitutes a transfer of assets for less than fair market value). If the expected return on the annuity is commensurate with a reasonable estimate of life expectancy of the beneficiary, the annuity can be deemed actuarially sound.
>
> *** The average number of years of expected life remaining for the individual must coincide with the life of the annuity. If the individual is not reasonably expected to live longer than the guarantee period of the annuity, the individual will not receive fair market value for the annuity based on the projected return. In this case, the annuity is not actuarially sound and a transfer of assets for less than fair market value has taken place, subjecting the individual to a penalty." State Medicaid Manual, Health Care Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994).

Transmittal 64 included two examples of this rule. If a 65-year-old man with a life expectancy of nearly 15 years purchases a $10,000 annuity with a 10-year term, the transfer of assets is actuarially sound. State Medicaid Manual, Health Care Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994). However, if an 80-year-old man with life expectancy of nearly seven years purchases the same annuity, "a payout of the annuity for approximately 3 years is considered a transfer of assets for less than fair market value and that amount is subject to a penalty." State Medicaid Manual, Health Care Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994). Transmittal 64 dictated that "States cannot apply

periods of ineligibility due to a transfer of resources for less than fair market value except in accordance with these instructions." State Medicaid Manual, Health Care Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994).

In Illinois, MANG recipients must not transfer assets for less than fair market value. See 305 ILCS 5/5–2.1(a) (West 2002). The legislature provided that the DPA "shall by rule establish the amounts of assets to be disregarded in determining eligibility for medical assistance, which shall at a minimum equal the amounts to be disregarded under [federal law]." See 305 ILCS 5/5–2(12) (West 2002). In a 1999 "Notice of Adopted Amendments," the DPA stated:

> "[The DPA] has become aware that the marketing of Medicaid planning devices sometimes includes plans offering back-end loaded annuities that pay only very small monthly amounts until the final month of life expectancy when a balloon payment reflecting the payout balance is made. Such annuity plans are intended to primarily benefit the person's heirs. While these annuities are literally consistent with current policy, they are in conflict with the intent of asset consideration for the purpose of equitable assistance eligibility determination." 23 Ill. Reg. 11301 (eff. August 27, 1999).

Thus, the DPA promulgated a regulation regarding annuity payments:

> "(e) A transfer is allowable if:
>
> * * *
>
> (13) the transfer was to an annuity, the expected return on the annuity is commensurate with the estimated life expectancy of the person, and the annuity pays benefits in approximately equal periodic payments." 89 Ill. Adm. Code §120.387(e)(13) (Conway Greene CD-ROM March 2002).

On January 31, 2002, 78-year-old Mary Fillbright, a resident in a long-term care facility, applied for medical assistance as a MANG recipient. That day, she also bought a balloon annuity for $73,713. The annuity would stretch payments over her life expectancy of 116 months; it would pay her $188.94 per month–$10 per month principal, plus interest–for 115 months and $72,741.94 in its final month. The final or balloon payment represented nearly 99% of the

˘5˘

purchase price. The annuity also provided:

> "On any anniversary prior to attaining age 101, you may request a determination of your then life expectancy. If the period thus determined is greater than the balance remaining for the current period, you may request an amendment to the new period. Such amendment will require a change in the monthly payment amount to that for the new period."

On March 11, 2002, caseworkers at the county DHS office found Fillbright eligible for medical assistance, but determined that her purchase of the balloon annuity constituted an improper transfer of assets because it violated the "equal periodic payment" regulation. Her benefits, which had been approved effective January 1, 2002, were subject to a 22-month penalty from April 2002 to January 2004.

Fillbright appealed this decision, arguing that the equal periodic payment regulation violated federal law, as enunciated in Transmittal 64. On June 25, 2002, the DHS conducted an administrative hearing, and on July 29, 2002, it considered and adopted the hearing officer's findings of fact and affirmed his decision. The DHS determined that, because Fillbright would not receive equal periodic payments from the annuity, she did not receive fair market value for it. The DHS rejected Fillbright's argument that the regulation violated federal law, stating it is "bound by its policy and regulations, and those arguments cannot be considered in this forum." The order was signed by DHS Secretary Linda Baker and DPA Director Jackie Garner. A cover letter noted that the order was the DHS's "Final Administrative Decision," as well as the DPA's final decision "as to Medicaid issues."

On August 22, 2002, Fillbright filed a complaint for administrative review by the trial court, naming as defendants the DHS, the DHS Secretary, and the DPA Director. Fillbright served summons on the DHS Secretary, but not on the DPA or its director. In her complaint, Fillbright claimed that the DHS's decision was incorrect because the purchase of the annuity was an actuarially sound transfer for fair market value. Fillbright again argued that the equal periodic payment regulation violated federal law.

The DHS filed a motion to dismiss the complaint because Fillbright failed to serve the DPA, a necessary party, and thus failed to comply with the Administrative Review Law. The DHS argued

that the final administrative decision was a decision by both the DHS and the DPA, and that the Administrative Review Law required Fillbright to serve both agencies. Fillbright responded that the DHS determines issues of Medicaid eligibility. The trial court denied this motion, reasoning that the DPA is a part of the DHS, and the DHS was served. The court stated, "Public Aid *** can clearly come in and defend. They're not prejudiced in any way because the [DHS] had proper notice in a timely fashion."

On September 15, 2003, the trial court confirmed the DHS's decision to impose the penalty period. The trial court stated that the question in this case is simple: "Does a Medicaid recipient who purchases a back-loaded annuity payable in full over the life-expectancy of the annuitant within the 'look back' period, engage in a non-allowable transfer of assets such that payment of benefits is deferred for a penalty period?" The answer, observed the court, is not so simple. The trial court further noted that, unfortunately, the DHS did not address this question, depriving the court of an agency reading of the equal payment regulation.

The trial court acknowledged "a tension between the need to preserve scarce public medical resources for the truly needy and the desire of families to preserve their assets while qualifying for medical assistance through a perceived legitimate loophole." According to the trial court, actuarial soundness and fair market value are distinct requirements; an annuity, in order to be considered a proper transfer of assets, must meet both. The court stated:

> "Once the Department determined the annuity in this case was not purchased for fair market value, it was incumbent upon [Fillbright] to show that in fact it was a fair market value transfer. Plaintiff relied solely on a legal argument for her position and presented no testimony to the hearing officer concerning the fair market value of the transfer. Under these circumstances, this court is unable to find that the Department erred."

Fillbright then appealed again, but died while her case was pending. Gillmore was appointed executrix of her estate and proceeded with the appeal. The appellate court affirmed. 354 Ill. App. 3d 497. The court initially reviewed Transmittal 64 and the equal periodic payment regulation. 354 Ill. App. 3d at 501-02. According to

the appellate court, the purpose for the fair market value requirement in Transmittal 64 is to provide a reliable indicator for Medicaid caseworkers trying to discern whether the annuity was intended for retirement planning or for sheltering assets. 354 Ill. App. 3d at 503. Like the trial court, the appellate court determined that fair market value and actuarial soundness are distinct concepts. 354 Ill. App. 3d at 503. The appellate court concluded that Fillbright's annuity was actuarially sound, but not purchased for fair market value. 354 Ill. App. 3d at 504. It was actuarially sound because the payment term coincided with her life expectancy. 354 Ill. App. 3d at 504. It was not purchased for fair market value because, in effect, the balloon payment would extend the term beyond her life expectancy. 354 Ill. App. 3d at 504. In theory, Fillbright would receive the final payment on the day before her death, and accordingly, "[T]he final payment on [her] annuity would not be used as her retirement income but as a payment to the designated beneficiary." 354 Ill. App. 3d at 504. The court continued:

> "The purchase of the back-loaded annuity with a benefit term equivalent to plaintiff's life expectancy cannot be deemed to be a valid retirement tool when the overwhelmingly substantial portion of the benefit would be paid the day before plaintiff's expected death. *** Based upon its terms, this type of plan is more likely viewed as a way to shelter assets for the purpose of Medicaid eligibility than as a valid retirement tool." 354 Ill. App. 3d at 504.

According to the appellate court, the state regulation did not conflict with federal regulations, but rather provided further guidance on them. 354 Ill. App. 3d at 504-05. The court held that the DHS correctly imposed a penalty period based on Fillbright's transfer of assets into the annuity. 354 Ill. App. 3d at 505.

We allowed Gillmore's petition for leave to appeal. See 177 Ill. 2d R. 315(a). We allowed the American Public Human Services Association to file an *amicus curiae* brief in support of the DHS. See 155 Ill. 2d R. 345. On the legal issues in this case, our standard of review is *de novo*. See *Carpetland U.S.A., Inc. v. Department of Employment Security*, 201 Ill. 2d 351, 369 (2002).

## ANALYSIS

In this appeal, Gillmore essentially raises a single issue: whether

the DHS's eligibility decision was correct. Before we reach that issue, however, we must dispose of an argument made by the DHS. The DHS insists that Gillmore's appeal must be dismissed because Fillbright failed to serve her complaint on the DPA. The trial court found that the DPA was part of the DHS for the purposes of Fillbright's case and denied the DHS's motion to dismiss. The appellate court declined to reach this argument because the DHS never cross-appealed.

Initially, we disagree with the appellate court. The DHS could not have cross-appealed the trial court's decision on its motion to dismiss because the trial court's final judgment on the merits of Fillbright's administrative review complaint was not adverse to the department. See *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386-87 (1983).

The Illinois Public Aid Code provides that it "shall be administered by the Department of Human Services and the Illinois Department of Public Aid as provided in the Department of Human Services Act." 305 ILCS 5/12–1(a) (West 2002). In 1996, section 80–10(d) of the Department of Human Services Act declared that the Department of Human Services is the successor agency to the Department of Public Aid with respect to certain functions. See 20 ILCS 1305/80–10(d) (West 2002). The Act did not shift responsibility over "Medical Assistance" or Medicaid to the DHS (see 305 ILCS 5/2–12(3) (West 2002)), but eligibility decisions rest with the DHS. Section 5–4 of the Public Aid Code provides, "The amount and nature of medical assistance shall be determined by the County Departments in accordance with the standards, rules, and regulations of the Illinois Department of Public Aid ***." 305 ILCS 5/5–4 (West 2002). Until 2002, "County Department" was defined as the County Department of Public Aid; thereafter, and in this case, it was the County Department of Human Services. Compare 305 ILCS 5/2–13 (West 2000) with 305 ILCS 5/2–13 (West 2002).

The Administrative Review Law applies to all proceedings in which a party seeks judicial review of an agency decision under article V. See 305 ILCS 5/11–8.7 (West 2002). Section 3–107(a) of the Administrative Review Law requires that "in any action to review any final decision of an administrative agency, the administrative agency *** shall be made [a] defendant[ ]." 735 ILCS 5/3–107(a)

(West 2002). "Administrative agency" means the department having the power to make administrative decisions. 735 ILCS 5/3‒101 (West 2002). "Administrative decision" means a determination by an agency which affects the rights and duties of the parties and terminates the proceedings. 735 ILCS 5/3‒101 (West 2002).

Certainly, where two agencies share the power to make the administrative decision at issue, both must be made defendants and served. See *ESG Watts, Inc. v. Pollution Control Board*, 191 Ill. 2d 26 (2000). But here only one agency, the DHS, had the power to decide Fillbright's Medicaid eligibility. The review of the county DHS office's finding that Fillbright was eligible for assistance, subject to a penalty, was signed by the DHS Secretary and, consistent with federal regulations, the DPA Director. See 42 C.F.R. §431.243 (2003) (the state Medicaid agency "must participate in the hearing" of an administrative appeal from an adverse eligibility decision, if it did not decide eligibility). We agree with Gillmore that the DPA simply endorsed the DHS's eligibility decision, and Fillbright properly served the DHS. We turn to the merits of Gillmore's appeal.

Gillmore contends that the DHS's eligibility decision was incorrect because Fillbright's annuity satisfied the requirements of Transmittal 64. According to Gillmore, the equal periodic payment regulation imposes a requirement which does not exist in federal law, and thus violates federal law. According to Gillmore, federal law addresses financial eligibility requirements, and the state cannot be more restrictive. Gillmore acknowledges that actuarial soundness and fair market value are distinct concepts, but insists that for Medicaid eligibility purposes, the sole federal test of whether a transfer of assets into a commercial annuity is permissible is simply actuarial soundness. If the term of the annuity was commensurate with Fillbright's life expectancy, then it was a transfer for fair market value, and therefore permissible.

Gillmore distinguishes between commercial annuities like the one purchased by Fillbright from private annuities, which are generally agreements between parents and children where the parents transfer money, often in trust, to the children with an understanding that the children will pay the money back to the parents over their life expectancy. Private annuities are like gifts and need not return fair market value. Commercial annuities, on the other hand, are purchased

on the open market and do return fair market value. Gillmore discusses the examples in Transmittal 64 and concludes that the only commercial annuity which can be characterized as a transfer for less than fair market value is an annuity whose term extends beyond the purchaser's life expectancy.

In response, the DHS agrees that state Medicaid plans must comply with the federal statutory and regulatory requirements, but asserts that the Medicaid scheme gives the states latitude for implementation. The DHS suggests that the federal definition of fair market value is so broad as to allow the state to create and impose more specific rules. The Medicaid Act does not define fair market value, but the state Medicaid manual defines it as the "estimate of the value of an asset, if sold at the prevailing price at the time it was actually transferred. Value is based on criteria you use in appraising the value of assets for the purpose of determining Medicaid eligibility." State Medicaid Manual, Health Care Financing Administration Pub. No. 45‑3, Transmittal 64, §3258.1(A)(1) (November 1994). According to the DHS, this reference to other "criteria" leaves room for the equal periodic payment regulation.

The parties have neither cited nor discussed any cases regarding the propriety of balloon annuities under the Medicaid Act and its regulations. Instead, they rely on cases from other jurisdictions that address Transmittal 64 in the context of nonballoon annuities. These cases, of course, do not bind this court, but they warrant some discussion.

Gillmore principally relies upon *Mertz v. Houstoun*, 155 F. Supp. 2d 415 (E.D. Pa. 2001), a federal district court case from Pennsylvania. In *Mertz*, a husband purchased two actuarially sound, nonballoon commercial annuities for $106,000 immediately before his wife entered a nursing home that participates in the Medicaid program. Shortly thereafter, the wife applied for Medicaid. The State welfare department determined that she was eligible for medical assistance, subject to a two-year penalty, because the purchase of the annuities violated a state welfare regulation creating a presumption that assets transferred during the look-back period were transferred in order to qualify for Medicaid. The wife then filed an administrative appeal of the state welfare department's decision, and the department denied her appeal. Rather than seeking judicial review in state court,

the wife filed a civil rights action in federal court. The wife asked for declaratory and injunctive relief, arguing that the annuities were actuarially sound and purchased for fair market value and, thus, the state welfare department violated federal law when it imposed a penalty period based on the regulatory presumption.

The federal district court reviewed the Medicaid Act and Transmittal 64, as well as the state Medicaid plan. *Mertz*, 155 F. Supp. 2d at 420-22. The court noted that the state welfare department found that the annuities were purchased for fair market value, but still penalized the transfers because the wife had not rebutted the regulatory presumption. *Mertz*, 155 F. Supp. 2d at 425. Federal law, however, penalizes only transfers made for less than fair market value. *Mertz*, 155 F. Supp. 2d at 425. In a footnote, the court explained:

> "The [state welfare department] seizes upon the portion of the sentence in Transmittal 64 which reads 'a determination must be made with regard to the ultimate purpose of the annuity' but omits the language immediately following which reads, 'i.e. whether the purchase of the annuity constitutes a transfer of assets for less than fair market value.' [Citation.] *** [T]he critical factor in determining whether the purchase of an annuity may be penalized is whether it was a purchase for fair market value, which is then essentially equated with actuarial soundness. Insofar as the [state welfare department] relies on [the statutory presumption] to penalize transfers made for fair market value *** upon a finding they were also made to qualify for benefits, the agency is engaging in a practice inconsistent with federal law. Insofar as that regulation is intended not merely to create a rebuttable presumption of an intent to qualify upon a finding of a transaction for less than fair market value but rather to penalize transfers made for fair market value upon a presumption or finding of such intent, the regulation is inconsistent with federal law." *Mertz*, 155 F. Supp. 2d at 425 n.13.

In closing, the court discussed the loophole in the Medicaid scheme which allows a couple to convert countable resources into noncountable income for the noninstitutionalized spouse by

purchasing a commercial annuity for the sole benefit of the noninstitutionalized spouse. *Mertz*, 155 F. Supp. 2d at 427. This loophole, "apparently discerned by lawyers and exploited by issuers who advertise such annuities as a means to qualify for Medicaid benefits," is inconsistent with the purpose of the Medicaid program to provide assistance to needy persons. *Mertz*, 155 F. Supp. 2d at 427. The court acknowledged that this loophole has proven frustrating to state Medicaid administrators across the country, but stated it was powerless to help: "It is not the role of the court to compensate for an apparent legislative oversight by effectively rewriting a law to comport with one of the perceived or presumed purposes motivating its enactment. It is for the Congress to determine if and how this loophole should be closed." *Mertz*, 155 F. Supp. 2d at 428.

*Dempsey v. Department of Public Welfare*, 756 A.2d 90 (Pa. Commw. 2000), an intermediate appellate court case from Pennsylvania, reaches the opposite conclusion. In *Dempsey*, a husband purchased two actuarially sound, nonballoon, commercial annuities for a total of $375,000 after a resource assessment by the county assistance office. The husband then applied for Medicaid on behalf of his wife. The county assistance office concluded that the transfer was improper under the same regulatory presumption as in *Mertz*, denied the wife's application, and declared her ineligible for medical assistance for more than six years. The state welfare department affirmed, and the husband appealed. The husband argued that Transmittal 64 is conclusive and allows the purchase of commercial annuities without penalty if they are actuarially sound. According to the husband, Transmittal 64 prohibited the state welfare department from making a presumption that the transfer was for less than fair market value and thus improper.

The appellate court affirmed, stating that actuarial soundness of an annuity does not place a transfer of assets to such an annuity beyond the review of the state welfare department. *Dempsey*, 756 A.2d at 93. According to the appellate court, the husband transferred almost $400,000 of assets immediately before applying for Medicaid on his wife's behalf, and the state welfare department "correctly presumed that the transactions were made for less than fair market value and for the impermissible purpose of qualifying for [Medicaid]." *Dempsey*, 756 A.2d 95. In fact, the court concluded, Transmittal 64

> "does not itself provide that a transfer of assets to an actuarially sound annuity establishes that the transfer may not under any circumstances render ineligible an applicant for [Medicaid]. As we read the provision, it is simply a guideline to aid caseworkers in determining whether or not an annuity appears on its face to be a legitimate instrument as opposed to an abusive shelter for assets." *Dempsey*, 756 A.2d at 95-96.

Accord *Bird v. Pennsylvania Department of Public Welfare*, 731 A.2d 660 (Pa. Commw. 1999).

Though we disagree with the result reached by the court in *Mertz*, we do agree with its comment that it is apparent annuities have been structured to bypass Medicaid limits and consequently to defeat the purpose of the Medicaid Act. Additionally, we find *Dempsey* more persuasive than *Mertz* on the issue of whether Transmittal 64 forecloses further state regulation. *Dean v. Delaware Department of Health & Social Services*, C.A. No. 00A‑05‑006 (Del. Super. December 6, 2000), *aff'd*, 781 A.2d 693 (Del. 2001), a trial court decision from Delaware upon which Gillmore relies, supports our position.

In *Dean*, a wife entered a nursing home. Her husband considered applying for Medicaid on her behalf and asked the state social services office for an assessment of their assets. The social services office determined that, not including the husband's community spouse resource allowance, they had assets $51,000 over Medicaid limits. The husband purchased an actuarially sound, nonballoon commercial annuity for $53,000 in order to spend down his resources. The social services office denied the wife's Medicaid application, and the husband asked for an administrative hearing. At the hearing, the husband's attorney, who specialized in "putting together Medicaid annuities for purposes of Medicaid qualification" testified. *Dean*, No. C.A. 00A‑05‑006. He described Transmittal 64 and stated that the husband's annuity was actuarially sound, making it noncountable under Medicaid. The social services office caseworker who reviewed the wife's application also testified. She stated that she was under the impression that the annuity was crafted in order to create eligibility, adding that the office considers transfers of assets for the sole purpose of becoming eligible for Medicaid to be improper. The administrative hearing officer sided with the social

services office because the annuity was an abusive shelter of assets. The husband filed a complaint for judicial review.

The trial court reversed, holding that the annuity complied with Transmittal 64, and the State was powerless to penalize it. *Dean*, No. C.A. No. 00A‒05‒006. The court discussed Transmittal 64, which

> "clearly suggests that sheltering, that is, moving or altering, assets solely in order to qualify for Medicaid is an abuse of the Medicaid system. It does so only by implication and by contrasting a valid retirement plan with a strategy to ensure eligibility. But it stops short of prohibiting such action. Worse yet, while [Transmittal 64] appears to denounce the purchase of an annuity for the purpose of qualifying for Medicaid, it inhibits the caseworker's ability to penalize such abuse by making the single determinative factor the question of fair market value." *Dean*, C.A. No. 00A‒05‒006.

The court stated that unlike the state in *Mertz*, the state in this case did not have a regulatory presumption that assets disposed of during the look-back period were disposed of to create Medicaid eligibility, despite "the obvious logic and utility" of such a presumption. *Dean*, C.A. No. 00A‒05‒006. According to the court, such a presumption is consistent with Transmittal 64 because Transmittal 64 "implicitly presumes that a transfer of assets for less than fair market value was for the purpose of qualifying for Medicaid." *Dean*, C.A. No. 00A‒05‒006.

Our research has revealed two very recent cases from Ohio involving Medicaid eligibility and balloon annuities. In *King v. Ohio Department of Job & Family Services*, 2005-Ohio-4939, an Ohio Court of Appeals affirmed a trial court decision which upheld an administrative decision by the Ohio Department of Job and Family Services. The department denied the application of a 94-year-old woman who purchased a commercial balloon annuity for $257,220.38 because she failed to present clear and convincing medical evidence pursuant to a state regulation that she would live beyond the balloon payment date. The court of appeals, however, did not address the eligibility issue, finding that the woman had not provided legal support for her arguments. See *King*, 2005-Ohio-4939, at ¶8.

*Fire v. Ohio Department of Job & Family Services*, 2005-Ohio-5214, provides more substantive analysis. *Fire* involved three consolidated appeals. In each case, a woman in her 80s purchased a balloon annuity after entering a nursing home. In each case the local Job and Family Services bureau denied their Medicaid applications and imposed penalty periods because the annuities were countable assets that put the women over Medicaid limits. Under a state regulation, a balloon annuity is a countable asset unless the Medicaid applicant can prove by clear and convincing evidence that she was expected to live past the date of the balloon payment. The State Job and Family Services director affirmed the local decisions, and the trial court affirmed the director's decisions. The women appealed.

The court of appeals reviewed the Medicaid Act and discussed the state regulations regarding eligibility. *Fire*, 2005-Ohio-5214, at ¶22. One of those regulations tracked Transmittal 64's actuarial soundness requirement, but added that the validity of a balloon annuity is not governed by life expectancy tables. *Fire*, 2005-Ohio-5214, at ¶30. Instead, the value of balloon annuity "will be deemed improperly transferred" unless the applicant can produce "clear and convincing medical evidence that the [applicant] is expected to actually live past the date of the balloon payment." *Fire*, 2005-Ohio-5214, at ¶30, citing Ohio Adm. Code §5101:1–39–22.8(E). The court of appeals agreed that the women had not rebutted this presumption:

> "The features inherent in the transfers made by [the women] indicate that the transfers were made with the intent to avoid using the resources for nursing home care. ***
>
> *** [T]here was insufficient evidence to support the [women's] claims that [the] purchased annuities were not improper transfers of assets for the purpose of meeting eligibility requirements for Medicaid; the [women] transferred significant funds to annuities almost immediately before each applied for Medicaid benefits." *Fire*, 2005-Ohio-5214, at ¶¶41-42.

The equal period payment regulation here, like the regulatory presumptions in *Dempsey*, *King*, and *Fire*, remains consistent with the spirit of Transmittal 64. The Medicaid Act is "among the most intricate ever drafted by Congress." *Schweiker*, 453 U.S. at 43, 69 L. Ed. 2d at 469, 101 S. Ct. at 2640. Though its provisions are dense,

circuitous, and often difficult to harmonize (*Mertz*, 155 F. Supp. 2d at 420 n.6), even this tangled web of interlaced legislation and regulation has gaps. The "actuarially sound" approach in Transmittal 64 was an attempt to close one such gap–annuities with terms longer than the Medicaid applicant's life expectancy. It simply did not address another–balloon annuities.[1]

The Medicaid scheme leaves to participating states like Illinois the task of fashioning reasonable standards for determining eligibility which "provide for reasonable evaluation of any [available] income or resources." 42 U.S.C. §1396a(a)(17)(C) (2000). The Medicaid Act is "designed to advance cooperative federalism," and the United States Supreme Court has "not been reluctant to leave a range of permissible choices to the States, at least where the superintending federal agency has concluded that such latitude is consistent with the statute's aims." *Wisconsin Department of Health & Family Services v. Blumer*, 534 U.S. 473, 495, 151 L. Ed. 2d 935, 954, 122 S. Ct. 962, 975 (2002). Though the Department of Health and Human Services has not definitively indicated that the states may penalize balloon annuities, the HCFA in Transmittal 64 did intimate that the aim of federal regulators and state caseworkers alike is "to avoid penalizing annuities validly purchased as part of a retirement plan but to capture those annuities which abusively shelter assets." State Medicaid Manual, Health Care Financing Administration Pub. No. 45–3, Transmittal 64, §3258.9(B) (November 1994).

---

[1]We note, however, that, according to a survey conducted by *amicus*, 25 of the 40 states who responded to a 2003 survey do not permit balloon annuities to bypass restrictions on transfers of assets. A consultant hired by the federal Department of Health and Human Services has recommended that that agency should specifically do the same. See R. Levy, *Analysis of the Use of Annuities to Shelter Assets in State Medicaid Programs* 58 (CNA Corp. 2005).

The benefit of treating an annuity as a trust is that an annuity transforms assets in the form of the purchase price into income. Thus, a person applying for Medicaid does not have to spend down those assets, but only the monthly income from the annuity. Balloon annuities take this approach to an extreme–minimizing income to shelter assets, instead of providing sufficient income for the Medicaid applicant. A balloon annuity returns fair market value only in a technical sense because the person purchasing it receives the disproportionately largest payment on the last day of her life, when she is unable to spend it, and the state is unable to enforce a spend down. In fact, Fillbright's immunity went a step further than most balloon annuities and included an amendment clause, which allowed her to push back the balloon payment if a redetermination of her life expectancy revealed a period longer than that left on the annuity. The structure of a balloon annuity demonstrates that its purpose is to shelter assets and not to provide income.

Somehow, according to Gillmore, the equal periodic payment regulation violated Transmittal 64, even though a stated goal of the federal scheme is to prevent shielding assets. She would bind the department to federal law where doing so would allow her annuity to shield assets, but ask the department to ignore the spirit of federal law, where doing so would close an obvious loophole. The DHS does not dispute that before the equal periodic payment regulation, an annuity such as Fillbright's was considered a proper transfer of assets. That regulation, however, turned such an annuity into an improper transfer. Because the equal periodic payment regulation was a permissible and reasonable standard to help caseworkers evaluate transfers of assets, we conclude that it did not violate federal law. Accordingly, we refuse to disturb the DHS's eligibility decision.

In a closing policy argument, Gillmore discusses and asks for our imprimatur on the reasons seniors would want to shelter assets. According to Gillmore, balloon annuities are asset shelters, but laudable ones because such annuities allow seniors to reserve a nest egg in the event they live past their life expectancy. She contends that we should somehow sanction Fillbright's purchase of a balloon annuity because Congress has not acted to provide seniors with more benefits or cheaper care. We acknowledge that this case has deep implications for seniors in Illinois. As Gillmore notes, the costs of long-term care are staggering, and seniors can exhaust their life

savings in a short time while in long-term care. But this coin has another side: the resources of Medicaid are similarly finite, a fact which will become increasingly apparent as our population ages. We decline to enter this fray. Decisions on how best to allocate public revenues are best left with the legislature.

## CONCLUSION

For the reasons that we have discussed, the judgment of the appellate court is affirmed.

*Affirmed.*