Lola AUSTIN, Appellant,

v.

**INDIANA FAMILY AND SOCIAL SERVICES ADMINISTRATION,** Appellee.

No. 64A04–1008–MI–514.

Court of Appeals of Indiana.

April 26, 2011.

Donald J. Evans, Valparaiso, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Kathy Bradley, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Lola Austin appeals the trial court's affirmance of Family and Social Services Administration's ("FSSA's") imposition of a transfer penalty upon her application for Medicaid nursing home benefits, which resulted in her being ineligible for such benefits for seven months. We affirm.

### Issue

The restated issue before is whether FSSA erred in imposing a transfer penalty based upon Austin's payment of $35,500 to her nephew, James Mack, and James's wife, Julianne Mack, prior to applying for Medicaid nursing home benefits.

### Facts

Austin, born in 1916, is the sister of James's father, who died in 1995. Austin has no children of her own. After James's father's death, the Macks took a more active role in looking after Austin's affairs and visiting her frequently at her home in Illinois. In 2002, after a series of events happened to Austin, including an investment broker stealing Austin's savings, two burglaries, and a battery, the Macks moved Austin into a home in Wanatah, near their own home. The Macks also took care of her personal needs while she lived there. Austin paid nothing to the Macks for these services, aside from paying $1000 per year to the Macks' children for their help. For the most part, Austin paid no rent to the Macks, with the exception of one payment of $6500 in October 2007, which was intended to cover the entire previous year Austin had lived in the house.

At some point in 2007, Austin was hospitalized, and it was determined she could no longer live on her own. She entered the Alzheimer's Unit of the Whispering Pines Health Care Center, a nursing home facility in Valparaiso, on September 2, 2007, and has resided there ever since. Meanwhile, however, the Macks began construction on an addition to their home in September 2007; James has contended that he built the addition for the purpose of Austin hopefully being able to live there, rather than either by herself or in a nursing home. On September 21, 2007, Austin signed a form naming the Macks her attorneys-in-fact.[1]

Austin's Medicare benefits for residing at Whispering Pines ran through November 2007. On November 29, 2007, the Macks, signing both on their own behalf and as Austin's attorneys-in-fact, executed a "Lifetime Care Agreement" ("the Agreement"). The Agreement stated that the

---

1. This apparently was only the most recent in a series of power of attorney forms that Austin had executed in favor of the Macks.

Macks were "agreeing to provide, monitor, arrange, complement and/or coordinate services designed to facilitate [Austin] being cared for during the remainder of her life in the least restrictive and least institutional environment...." App. p. 5. The Agreement further stated that the Macks would provide a number of services to Austin for the remainder of her life, including but not limited to: preparation of food; assisting with grooming, laundry, and personal shopping (using Austin's funds); monitoring Austin's health care needs, including attendance at care plan meetings at Whispering Pines; frequently visiting Austin and arranging for outings for her as she was able; and interacting with health professionals, social service providers, insurance companies, and government agencies on her behalf. As for compensation, the Agreement provided, based on Austin's actuarial life expectancy and an average cost of $12 per hour for the services and an estimated fifteen hours per week to provide them, that the total value of the services to be provided by the Macks was $41,236. However, the Macks agreed to accept only $35,500 from Austin, as that was the full extent of her savings at the time. The Macks immediately used the $35,500 to help pay for the addition to their house.

On December 12, 2007, James filed an application for Medicaid nursing home benefits with FSSA on behalf of Austin. FSSA denied this application on January 24, 2008, on the basis that Austin's resources exceeded the Medicaid eligibility limit.

On April 18, 2008, James filed another application for Medicaid benefits with FSSA, retroactive to December 2007. James believed the first denial was erroneous because it failed to take into consideration that several checks from Austin's checking account had been outstanding at the time of the first application, and that the cashing of those checks would have lowered her resources below the Medicaid eligibility limit. On May 19, 2008, FSSA generally approved the application. However, FSSA stated that it was imposing a transfer penalty based on the November 2007 payment of $35,500 to the Macks, which resulted in Austin being denied coverage for nursing home benefits from December 2007 through July 2008. Whispering Pines has never been paid for Austin's residence there during those months.

Austin and the Macks appealed the imposition of the transfer penalty. An administrative law judge ("ALJ") held a hearing in the matter on August 6, 2008, and affirmed the imposition of the transfer penalty on September 9, 2008. On September 30, 2008, FSSA affirmed the ALJ's ruling, and Austin and the Macks sought judicial review of that ruling. On July 23, 2010, after conducting a hearing, the trial court affirmed FSSA's ruling. Austin now appeals.

## Analysis

In an appeal from a decision of an administrative agency, our standard of review is governed by the Administrative Orders and Procedures Act ("AOPA"). *Development Servs. Alternatives, Inc. v. Indiana Family & Soc. Servs. Admin.*, 915 N.E.2d 169, 176 (Ind.Ct.App.2009) *trans. denied*. When reviewing an administrative agency decision, a court may neither try the case de novo nor substitute its judgment for that of the agency. *Id.* (citing Ind.Code § 4–21.5–5–11). Judicial review of disputed issues of fact must be confined to the agency record for the challenged action, and we will not reweigh the evidence. *Id.* We defer to the expertise of the administrative body, and will reverse the agency's decision only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to a constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(4) without observance of procedure required by law; or

(5) unsupported by substantial evidence.

I.C. § 4–21.5–5–14(d). A decision is arbitrary and capricious only if it is made without any consideration of the facts and lacks any basis that could lead a reasonable person to make the same decision made by the administrative agency. *Id.* The burden of demonstrating the invalidity of an agency action is on the party asserting its invalidity. *Id.* (citing I.C. § 4–21.5–5–14(a)).

■■■ Generally, although we defer to an agency's findings of fact, we do not defer to its conclusions of law. *Indiana Dep't of Envtl. Mgmt. v. Steel Dynamics, Inc.*, 894 N.E.2d 271, 274 (Ind.Ct.App. 2008), *trans. denied.* However, with respect to an agency's interpretation of statutes and regulations that is charged with enforcing, such interpretation is entitled to great weight, and we should accept the agency's reasonable interpretation of such statutes and regulations, unless the agency's interpretation would be inconsistent with the law itself. *Id.* We further observe that FSSA, in addition to promulgating official regulations with respect to Medicaid administration, also has compiled an Indiana Client Eligibility System Manual ("ICES manual") to guide caseworkers in making eligibility determinations. It has been held that similar guidelines, although neither statutes nor regulations, are entitled to deference by courts so long as they are consistent with the plain language and purposes of the appropriate

statutes and prior administrative views. *See Gillmore v. Illinois Dep't of Human Servs.*, 354 Ill.App.3d 497, 291 Ill.Dec. 7, 822 N.E.2d 882, 886 (2004), *aff'd*, 218 Ill.2d 302, 300 Ill.Dec. 78, 843 N.E.2d 336 (2006). Austin does not take issue with the validity of the ICES manual's guidelines.

■■■ The Medicaid Act states that, with respect to coverage for nursing facility services, if an institutionalized person or that person's spouse disposes of assets for less than fair market value on or after a specific "look-back date," within either thirty-six or sixty months before a person applies for Medicaid, depending on the circumstances, then the person is ineligible for nursing facility coverage for a certain period of time. *See* 42 U.S.C. § 1396p(c)(1)(A). This period of non-coverage is known as a transfer penalty, and Congress's purpose in enacting the penalty was to maximize the available resources for Medicaid and limit them to those truly in need. *See E.S. v. Div. of Med. Assistance & Health Servs.*, 412 N.J.Super. 340, 990 A.2d 701, 703–04 (2010). Specifically, "In 1993, Congress sought to combat the rapidly increasing costs of Medicaid by enacting statutory provisions to ensure that persons who could pay for their own care did not receive assistance." *Gillmore v. Illinois Dep't of Human Servs.*, 218 Ill.2d 302, 300 Ill.Dec. 78, 843 N.E.2d 336, 338 (2006).

Indiana has implemented the transfer penalty provision of the Medicaid Act through a regulation, 405 Indiana Administrative Code 2–3–1.1(c), which largely mirrors the language of 42 U.S.C. § 1396p(c). In addition, as noted, the ICES manual provides further guidance as to what constitutes a disposition of assets for less than fair market value that would trigger a transfer penalty. The ICES manual contains the following discussion on the subject:

Consideration is whatever compensation the individual received in return for the transferred property. In order to determine a transfer as nonviolative, the individual must have received adequate consideration. Consideration is adequate when the fair market value minus loans, mortgages or other encumbrances, of the transferred property is equal to the consideration received. Fair market value is the current market value of the property at the time of the transfer.

The applicant/recipient is required to supply any necessary records, documentation and information which verifies the fair market value and consideration received.

The value of the consideration received is based on the agreement and expectation of the parties *at the time of the transfer* .... The compensation received for an asset must be in a tangible form with intrinsic value. For example, love and affection does not constitute adequate consideration because there is no dollar value attributable to love and affection.

App. p. 187.

There is no question here that Austin transferred the $35,500 to the Macks within the potential transfer penalty "lookback" period, prior to either of her Medicaid applications. The sole disputed issue is whether Austin received fair market value consideration in exchange for that $35,500. No Indiana statute, regulation, or reported case has addressed whether a "care agreement," such as the one here, may constitute adequate fair market value consideration in exchange for a lump-sum cash payment from a nursing home resident, nor does the ICES manual directly

address the question. We also observe that FSSA does not challenge the legal, contractual validity of the Agreement. It only argues that it did not have a fair market value of $35,500.

Several other jurisdictions have had the opportunity to address whether a "lifetime care agreement" constituted adequate, fair market value consideration in exchange for a nursing home resident's lump sum cash payment prior to applying for Medicaid. No one overarching rule can be derived from these cases. Instead, the decisions appear to have been very fact sensitive and dependent on the particular circumstances in each case, such as the precise wording of the agreement, or the extent of evidence submitted that the recipient of the funds actually provided valuable services to the donor/Medicaid applicant.

One such case is *Reed v. Missouri Department of Social Services, Family Support Division*, 193 S.W.3d 839 (Mo.Ct.App. 2006). In *Reed*, a nursing home resident transferred $11,000 to her daughter, who in turn agreed to be a "Care Provider" to her mother under a "Personal Care Contract." The terms of that contract appear to be nearly identical to those in the Agreement signed here by the Macks in its description of duties that the daughter was to perform. After the mother applied for Medicaid nursing home benefits,[2] the Missouri equivalent of FSSA imposed a transfer penalty based on the $11,000 payment because it was a transfer of assets for less than fair market value. The Missouri court held that the state agency had erred in its determination. It recounted very extensive evidence in the record regarding the wide range of services to her mother that the daughter provided that enhanced

**2.** The *Reed* opinion never explicitly states that the mother applied for Medicaid benefits or cites any Medicaid statutes or regulations; however, it is apparent that she did apply for such benefits.

the mother's life "in ways that the facility does not, and are above and beyond the care provided by the facility." *Reed,* 193 S.W.3d at 842–43. *See also Brewton v. State Dep't of Health & Hosps.,* 956 So.2d 15, 19–20 (La.Ct.App.2007) (holding that "Personal Care Service Agreement" was adequate fair market value consideration in exchange for $118,805.22 payment where the recipients of the funds had performed services very similar to those of the daughter in *Reed* ).

A New Jersey court took a different view of a similar contract in *E.S. v. Division of Medical Assistance & Health Services,* 412 N.J.Super. 340, 990 A.2d 701 (2010). In *E.S.,* a ninety-seven year-old nursing home resident made a lump sum payment of $56,550 to her daughter, who in turn executed a "life care contract" to provide services to her mother. The New Jersey equivalent of FSSA imposed a transfer penalty upon the mother's Medicaid benefits application, and the *E.S.* court affirmed that ruling. The court was critical of *Reed* and *Brewton,* claiming they had improperly looked at evidence of services actually provided by the fund recipients after the execution of the contracts, and stating they had "completely ignore[d]" legislative intent in creating the transfer penalty and other mechanisms "to regulate devices created solely to shelter assets, and/or income, ... in preparation for application for Medicaid benefits." *E.S.,* 990 A.2d at 708.

The *E.S.* court cited several other reasons to attach no fair market value to the "life care contract." First, it contained a non-transferability clause, meaning it could not be sold on the open market. Second, it imposed no requirement upon the caregiver to actually work a certain amount of time in order to earn the prepaid money. Third, it could potentially lead to a great windfall to the caregiver if either the care-

giver or the nursing home resident died before the resident's life expectancy. If the caregiver died, his or her estate would be entitled to retain the full advance payment, and if the resident died, the caregiver him- or herself again would be permitted to retain the full advance payment; in either case, those funds would not have been actually earned by the caregiver. Ultimately, the New Jersey court held, "The [lifetime care contract] is worthless on the open market; it is specious to suggest otherwise." *Id.* at 710.

We conclude that the *E.S.* court was overly-harsh in its assessment of *Reed* and *Brewton.* We are not prepared to say, categorically, that contracts such as the Agreement here could never be considered a fair market value exchange for a Medicaid applicant's assets. The ICES manual does permit consideration in exchange for a transfer of assets to take the form of services, if it "is based on the market value of such services and the frequency and duration of the services." App. p. 188. We also happen to agree generally with the approach apparently taken by the *Reed* and *Brewton* courts; namely, that fair market value in this context question presents largely a question of fact, or at most a mixed question of law and fact, which can and possibly should include an examination of whether a care provider under a personal services contract is or has been actually providing valuable services to a nursing home resident that substantially exceed the services provided by the nursing home. Here, the FSSA considered the evidence and concluded, essentially, that the Agreement was not worth what Austin paid for it, and imposed a transfer penalty for that reason. We defer to the FSSA's finding and will not reweigh the evidence on this point; we do not rule out the possibility that under a different set of facts, a similar agreement would *not* give rise to a transfer penalty.

Before examining the particulars of the Agreement here, we wish to explore further the definition of "fair market value." The ICES manual's definition of the term as the "current market value of the property at the time of the transfer" is not especially helpful or clarifying. App. p. 187. The ICES manual does, however, go on to explicitly exclude "love and affection" as valid consideration for an asset. It also requires a Medicaid applicant to provide documentation supporting the claim that a pre-application transfer of assets was exchanged for fair market value consideration.

The Court of Appeals of Michigan also recently explored the meaning of "fair market value" in the Medicaid transfer penalty context in *Mackey v. Dep't of Human Servs.*, 289 Mich.App. 688, —— N.W.2d —— (2010). It noted that the general definition and common understanding of "fair market value" is that it is " '[t]he price that a seller is willing to accept and a buyer is willing to pay *on the open market and in an arm's-length transaction;* the point at which supply and demand intersect.' " *Mackey*, 289 Mich. App. at ——, —— N.W.2d at —— (quoting Black's Law Dictionary 1549 (7th ed.) (emphasis added)). An "arm's-length" transaction, in turn, refers to dealings between two parties who are not related and not in a confidential relationship, and who are presumed to have roughly equal bargaining power. *Id.* Additionally, an "arm's-length" transaction generally must be voluntary (without compulsion or duress), take place on the open market, and the parties must act in their own self-interest. *Id.*

There can be no doubt here that this particular transaction was not an "arm's-length" one, with the Macks signing the Agreement both on their own behalf and on behalf of Austin as her attorneys-in-fact. Indeed, this appears to be "a classic example of self-dealing by a fiduciary." *See In re Estate of Rickert*, 934 N.E.2d 726, 730 (Ind.2010). In such a situation, we believe FSSA and the courts are justified in turning a skeptical eye toward "personal care" contracts and carefully examining whether they truly represent a fair market value exchange for cash or assets of a nursing home resident. Such skepticism is consistent with the Congressional policy of ensuring "that only applicants whose income and resources fall below a specified level will qualify" for Medicaid nursing home coverage. *E.S.*, 990 A.2d at 706.

As to the particulars of the Agreement, the ALJ found that the services it required the Macks to perform for Austin largely replicated services already being performed by Whispering Pines. We agree with this finding. Such things as food preparation, laundry, and seeing to Austin's daily grooming and medical needs were provided by the nursing facility. There was a lack of evidence that the Macks provided services in those areas substantially in excess of what the nursing home provided. *Cf. Reed*, 193 S.W.3d at 843 (noting, inter alia, that daughter frequently prepared and brought food to her mother in the nursing home and often took her out to eat). Conversely, the ALJ found no evidence that Whispering Pines was failing to adequately care for Austin, such that the Macks had to substantially supplement what the facility was doing. Austin already was residing at Whispering Pines when the Agreement was executed, and there is no evidence that there was at that time any medically-based hope of her ever leaving the facility.

The ALJ also noted evidence that the Macks had not attended health care planning meetings for Austin at Whispering Pines in November 2007 and January, March, and June 2008. The Macks dis-

pute that they received notice of these meetings; we believe it was a matter of credibility for the ALJ to resolve that dispute, or to conclude that the Macks as Austin's caregivers under the Agreement should have been more proactive in ensuring that they attended those meetings. The Macks also failed to provide any documentation as to the amount of time they actually spent fulfilling their obligations under the Agreement. Julianne testified that she spent on average seven hours per week taking care of Austin's needs; the Agreement's compensation level was based on the provision of fifteen hours per week of service, or eight hours more than Julianne testified to. We also note that to the extent the Agreement purported to obligate the Macks to visit with Austin on a regular basis and take her on excursions from Whispering Pines,[3] such visitations appear to fall within the realm of "love and affection" for Austin, which, reasonably, is not included within a calculation of fair market value consideration under the terms of the ICES manual.

We also are troubled, as was the ALJ, with the fact that if Austin died before her actuarial life expectancy, the Macks were under no legal obligation to return any of the unearned monies that they had been paid in advance and that had been calculated on the basis of Austin's life expectancy. The same would be true if it became impossible because of death or other reasons for the Macks to fulfill their end of the bargain for the full extent of Austin's life expectancy. It is true that Austin potentially could outlive her life expectancy, and the Agreement would require the Macks to continue providing services after that date. However, while this kind of risk-taking as to pre-paying for services that may never

be delivered might be reasonable in a purely private setting, here we are concerned with the protection of taxpayer funds and limiting the use of those funds to persons who truly are in need of them. In other words, a "personal care" agreement such as the one here could result in a potential windfall to the care provider, at the expense of taxpayers who paid for the care recipient's nursing home care because a pre-Medicaid application lump sum payment to the care provider caused the applicant's resources to fall below the eligibility limit. That is improper and contrary to the purposes of the Medicaid Act.

We reiterate the evidence most favorable to the ALJ's ruling, i.e. the replication of services between the Agreement and what Whispering Pines was providing and the lack of clear evidence as to the extent of services that the Macks actually were providing to Austin, as well as the ALJ and FSSA's reasonable interpretation of the laws and regulations concerning transfer penalties. In doing so, we cannot conclude the FSSA's decision that the Agreement was not fair market value consideration in exchange for $35,500 was arbitrary and capricious, or an abuse of discretion, or unsupported by substantial evidence. If, as here, there is a finding that a Medicaid applicant disposed of assets for less than fair market value during the penalty period, the applicant may avoid the transfer penalty if he or she can prove that he or she intended to dispose of the assets for fair market value, or the assets were transferred exclusively for a purpose other than to qualify for medical assistance, or all transferred assets have been returned to the applicant. 405 Ind. Admin. Code 2–3–1.1(k). Austin makes no argument that she is exempt from the

---

3. In any event, there was evidence that as of the date of the August 2008 ALJ hearing, Austin had been signed out from Whispering Pines on only one occasion, at Christmas 2007.

transfer penalty for making a less than fair market value transfer of assets under any of these provisions.

### Conclusion

We affirm the trial court's affirmance of FSSA's decision to impose a transfer penalty upon Austin's application for Medicaid nursing home benefits based upon her transfer of $35,500 to the Macks for less than fair market value.

Affirmed.

RILEY, J., and DARDEN, J., concur.