# Illinois Official Reports

## Appellate Court

*Tjaden v. State of Illinois*, 2013 IL App (4th) 120768

| | |
|---|---|
| Appellate Court Caption | GLORIA TJADEN, By and Through Stanley Tjaden, Her Agent, Plaintiff-Appellee, v. THE STATE OF ILLINOIS, Acting Through THE DEPARTMENT OF HUMAN SERVICES and MICHELLE R.B. SADDLER, Its Secretary; and THE DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES and JULIE HAMOS, Its Director, Defendants-Appellants.–WILLARD GREER, By and Through John Greer, His Special Representative, Plaintiff-Appellee, v. THE STATE OF ILLINOIS, Acting Through THE DEPARTMENT OF HUMAN SERVICES and MICHELLE R.B. SADDLER, Its Secretary; and THE DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES and JULIE HAMOS, Its Director, Defendants-Appellants.–GLORIA TJADEN, By and Through Stanley Tjaden, Her Agent, Plaintiff-Appellee, v. THE STATE OF ILLINOIS, Acting Through THE DEPARTMENT OF HUMAN SERVICES and MICHELLE R.B. SADDLER, Its Secretary; and THE DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES and JULIE HAMOS, Its Director, Defendants-Appellants. |
| District & No. | Fourth District<br>Docket Nos. 4-12-0768, 4-12-0918, 4-12-1087 cons. |
| Filed | December 24, 2013 |
| Rehearing denied | January 22, 2014 |

Held

(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*)

In actions arising from the financial transactions plaintiffs made in the course of applying for Medicaid benefits when they entered into nursing homes, the decisions of the Department of Healthcare and Family Services and the Department of Human Services imposing penalty periods for long-term-care services based on the Departments' refusal to recognize partially returned gifts made to children and life insurance contracts purchased to fund burial expenses were improperly reversed by the trial courts involved in the consolidated appeals, since the Departments were not required to provide plaintiffs with partial credit for partially returned gifts, the life insurance contracts plaintiffs purchased were not supported by actual burial contracts, and plaintiffs failed to show that they received fair market value for their purchases.

Decision Under Review

Appeal from the Circuit Court of Sangamon County, Nos. 11-MR-188, 10-MR-405; the Hon. John Schmidt and the Hon. Leslie J. Graves, Judges, presiding.

Judgment

No. 4-12-0768, Reversed.
No. 4-12-0918, Reversed.
No. 4-12-1087, Reversed.

Counsel on Appeal

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Carl J. Elitz (argued), Assistant Attorney General, of counsel), for appellants.

Duane D. Young (argued), of Labarre, Young & Behnke, of Springfield, for appellees.

Panel

JUSTICE POPE delivered the judgment of the court, with opinion.
Justices Knecht and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1     These consolidated appeals arise from judgments entered by the circuit courts reversing the final administrative decisions of defendants, the Department of Healthcare and Family Services (HFS) and the Department of Human Services (DHS) (collectively, the Departments) granting plaintiffs, Gloria Tjaden's and Willard Greer's, applications for Medicaid assistance while imposing penalty periods of noneligibility due to certain nonallowable asset transfers. The courts reversed the administrative decisions with regard to those penalty periods.

¶ 2     The Departments appeal, arguing the penalty periods imposed were proper where (1) the Departments were not required to recognize partially returned gifts for credit and (2) no exempt burial contracts were purchased. We reverse the circuit courts' judgments and affirm the administrative decisions.


¶ 3                                    I. BACKGROUND
¶ 4                          A. Gloria Tjaden (Nos. 4-12-0768, 4-12-1087)
¶ 5     In April 2009, Tjaden purchased a life insurance policy for $12,000. The proceeds of the policy were assigned to create an irrevocable trust. The trust agreement required the trustee to pay Tjaden's funeral and burial expenses if a bill was presented within 45 days of her death. After those 45 days, however, the trustee was prohibited from authorizing any payment of expenses. Instead, the funds would pass, condition-free, to the residual beneficiary, *i.e.*, Tjaden's son.

¶ 6     In May 2009, Tjaden transferred $4,202.79 to her son. In June 2009, Tjaden applied for Medicaid assistance. In July 2009, Tjaden's son wrote her a check for $100.

¶ 7     On September 23, 2009, the Departments approved Tjaden's application but determined she was ineligible for Medicaid funding for a four-month period. The Departments determined the $4,202.79 transfer to Tjaden's son was nonallowable and assessed a one-month penalty. Tjaden was also assessed an additional three-month penalty because the Departments determined Tjaden did not receive fair market value for the $12,000 insurance policy purchase. The penalty period ran from April 2009 through July 2009.

¶ 8     Tjaden appealed, and an administrative hearing was held on July 7, 2010. During the hearing, Tjaden argued the estimate from the funeral home for anticipated goods and services was sufficient to show she received fair market value for the insurance purchase. Tjaden also argued because her son returned $100 to her in July 2009 the May 2009 transfer was really $4,102.79, not $4,202.79, which was less than the $4,140 private-pay rate for the nursing home. Tjaden contended she should receive a "zero-month" penalty, *i.e.*, not be penalized, for May 2009 because the partial repayment was less than Tjaden's private pay rate.

¶ 9     On April 25, 2011, the Departments issued a joint final administrative decision, which found the following:

> "Regarding [Tjaden's] transfer of $12,000.00 in April 2009 to purchase a life insurance policy which was then placed in an irrevocable trust[:] the Department's policy states that a burial contract is required for burial funds to be considered as

- 3 -

exempt. Department policy does not provide an exemption for burial funds without a burial contract. In this case, [Tjaden] presented no burial contract. In fact, although [Tjaden] provided an estimate showing that the cost for services would be $12,004.12, absent a burial contract with a funeral home, or other guarantee that the full amount of the transferred assets will be used solely for the intended purpose, the Department cannot determine if fair value was received. Therefore, the determination by the Department that the transfer of $12,000.00 was non-allowable and subject to the imposition of a penalty period will be upheld. ***

Regarding the May 2009 transfer of $4,202.79, again [Tjaden] received no compensation for these funds. Therefore, this transaction was a non-allowable transfer of assets. Although [Tjaden] argued that $100.00 was subsequently returned to [Tjaden] by her son in July 2009, and that the amount of the transfer was effectively reduced to less than one month at the private pay rate of $4,140.00, the Department's policy cited above does not provide for consideration of a partial repayment of a non-allowable transfer. Moreover, while the State Medicaid Manual allows states to modify the penalty period if partial payment of an asset is returned, it does not mandate that such modifications be adopted by the states. Therefore, the determination by the local office that the May 2009 transfers were non-allowable transfers resulting in an additional one month penalty period will be upheld."

¶ 10    On May 5, 2011, Tjaden filed a complaint in the circuit court seeking administrative review of the Departments' decision.

¶ 11    Following a July 16, 2012, hearing, the circuit court affirmed the Departments' decision to disallow Tjaden credit for the partial gift return but set aside the Departments' determination regarding the insurance policy purchase.

¶ 12    On August 14, 2012, the Departments filed their notice of appeal regarding the circuit court's July 16, 2012, ruling reversing the administrative decision regarding the insurance policy purchase. That appeal was docketed as appellate court case No. 4-12-0768.

¶ 13    That same day, Tjaden filed a motion to reconsider the portion of the circuit court's judgment affirming the Departments' administrative decision to disallow the partial gift return. In her motion, Tjaden argued the Departments had published a new administrative rule on November 14, 2011, regarding partial returns of gifts, which provided the following:

"For transfers occurring prior to January 1, 2012, if only parts of transferred assets are returned, a penalty period shall be reduced but *not eliminated*. For example, if only half the value of the asset is returned, the penalty period shall be reduced by one half." (Emphasis added.) 89 Ill. Adm. Code 120.388(m)(6)(A), added at 35 Ill. Reg. 18645 (eff. Jan. 1, 2012).

We note the parties appear to concede the amended rule is not controlling in this case as the Departments' administrative decisions were made prior to the amendment's effective date. However, Tjaden contends this language is a clear declaration of what had been the Departments' "long-standing policy."

¶ 14 On October 2, 2012, Tjaden filed a supplement to her brief in support of the motion to reconsider. Tjaden asked the circuit court to take judicial notice of In re J. Carl Smith (Appeal All-011 493-MANG (Sept. 20, 2012)), another administrative decision by the Departments, which cited the new administrative rule and recognized partial gift returns. According to Tjaden, to allow the Departments "to hold and apply two contradictory interpretations of the same rule violates due process of law under both the U.S. and Illinois constitutions." The Departments objected to the introduction of the new evidence, noting that case was itself on administrative review in the circuit court and arguing the court's review was limited to the evidence submitted during the administrative hearing. See 735 ILCS 5/3-110 (West 2012) (court on administrative review is limited to consideration of the evidence submitted in the administrative hearing and may not hear additional evidence); *Pisano v. Giordano*, 106 Ill. App. 3d 138, 140, 435 N.E.2d 899, 901 (1982) ("judge sitting in an administrative review proceeding is expressly forbidden to go outside the record in rendering a decision").

¶ 15 In its October 11, 2012, order, the circuit court stated it took judicial notice of the administrative decision tendered by Tjaden and found the following:

> "[T]he court now has the benefit of the [Departments'] own interpretation of the applicable rule including the amended rule issued by the [Departments] in the Department's Policy Manual 07-02-20-b, as amended effective July 2, 2012. *** Based on the interpretation of the rule in question by the [Departments], as set forth in the appeal of *J. Carl Smith*, Appeal All-011 493-MANG, and giving deference to that interpretation, the Motion to Reconsider should be granted."

¶ 16 On November 13, 2012, the Departments filed their notice of appeal from the circuit court's October 11, 2012, order. That appeal was docketed as appellate court case No. 4-12-1087. (Because the trial court's rulings underlying case Nos. 4-12-0768 and 4-12-1087 amount to a net reversal of the Departments' administrative decision, we will treat the issues in those cases as a single appeal for purposes of this disposition.)

¶ 17 B. Willard Greer (No. 4-12-0918)

¶ 18 On August 29, 2008, Greer entered a long-term-care facility. That same day Greer applied for Medicaid benefits.

¶ 19 In the months prior to his August 29, 2008, application for Medicaid benefits, Greer wrote six checks to his son. Each check was for $4,500.

¶ 20 In September 2008, while Greer's application was being processed, Greer's son wrote six checks, for $2,019 each (a total of $12,114), to Greer. The memo on each check indicated the payments were intended as partial returns of the $4,500 gifts made in March, April, May, June, July, and August 2008. Also in September 2008, Greer purchased a $12,000 life insurance policy. The proceeds of the policy were assigned to create an irrevocable trust. The terms of the trust required the trustee to pay Greer's funeral and burial expenses as long as evidence of those expenses was presented to the trustee within 45 days of Greer's death. After 45 days, however, the trustee is prohibited from paying those expenses. In that case, the funds pass to the residual beneficiary, *i.e.*, Greer's children.

¶ 21    On March 4, 2009, the Departments approved Greer's application but imposed an eight-month period of noneligibility (from August 2008 through March 2009) because they determined the cash transfers from Greer to his son and the insurance policy purchase were nonallowable asset transfers. (The Departments also imposed a February 2007 through July 2008 penalty period related to other nonallowable transfers. However, during the administrative hearing, Greer stated he was challenging only the August 2008 through March 2009 penalty period and not the February 2007 through July 2008 period.)

¶ 22    Greer appealed, and an administrative hearing was held on December 2, 2009. During the hearing, Greer presented, *inter alia*, a copy of the trust agreement, as well as an estimate from the funeral home for anticipated goods and services in the amount of $11,781.81. Greer argued the estimate was sufficient to show he received fair market value for the $12,000 life insurance purchase. Greer also argued both the Departments' policy manual as well as federal law requires the Departments to recognize a partial return of a nonallowable asset transfer. According to Greer, the checks his son wrote should have been credited to him as partial gift returns.

¶ 23    On June 11, 2010, the Departments issued a joint final administrative decision denying Greer's request for credit for the returned gifts. The Departments also determined the funeral arrangements and life insurance purchase made with the $12,000 transfer were insufficient to qualify as an exempt transfer where no evidence of a burial contract existed. Specifically, the Departments found the following:

> "On September 19, 2008, [Greer's son] deposited six checks, in the amount of $2,019.00 each, into [Greer's] checking account, for a total of $12,114.00. [Greer] has stated that these checks represent a partial repayment of the $4,500 gifted monthly to [his son] from March through August 2008. The policy above, however, provides that a transfer of assets for less than the fair market value of those assets is a non-allowable transfer. Although [Greer] has argued that $2,019.00 represents a partial repayment of the $4,500.00 monthly [amounts] that [were] gifted to [his son,] the above policy does not provide for consideration of a partial repayment of a non-allowable transfer. PM 07-02-20-b shows that a transfer for less than fair market value is a non-allowable asset transfer. Therefore, the determination by the local office that the monthly transfers of $4,500.00 from [Greer's] account are non-allowable transfers for which [Greer] did not receive fair market value will be upheld.

> In regards to [Greer's] transfer of $12,000.00 in September 2008 into an irrevocable trust, PM 07-02-08, PM 07-02-08-c, PM 08-02-08-d[,] and WAG 08-02-08-d show that a burial contract is required for burial funds to be considered exempt. PM 08-02-08-c addresses only a prepaid burial contract in regards to an irrevocable trust. PM 08-02-08-d addresses only a prepaid burial funded by life insurance. Neither policy nor any other Department policy allows an exemption for burial funds without a burial contract. In this case, [Greer] presented no burial contract[;] therefore, the determination by the local office that the $12,000 that was deposited into the irrevocable trust is a non-exempt asset will be upheld.

- 6 -

Accordingly, the determination by the local office that [Greer] has a penalty period for the months of August 2008 through March 2009 will be upheld."

¶ 24 On July 15, 2010, Greer filed a complaint in the circuit court seeking administrative review of the Departments' decision.

¶ 25 In its August 23, 2012, order, the circuit court held the Departments erred in not crediting Greer for the partial return of the gifts to his son. The court also found Greer properly purchased a prepaid burial contract for fair market value. The court set aside the Departments' decision and remanded the matter with directions to recalculate Greer's penalty period accordingly.

¶ 26 On September 21, 2012, the Departments appealed the circuit court's decision.

¶ 27 On December 28, 2012, this court consolidated the Departments' appeals in appellate court case Nos. 4-12-0768, 4-12-1087, and 4-12-0918.

¶ 28 This appeal followed.

¶ 29 II. ANALYSIS

¶ 30 On appeal, the Departments argue the administrative decisions should be affirmed where they (1) correctly denied Tjaden and Greer partial credit for their children's partially returned gifts where the credit was not provided for by the Departments' policy manual, and (2) properly characterized Tjaden's and Greer's $12,000 life insurance purchases as nonexempt where no burial contracts existed and no showing was made they received fair market value for the purchases.

¶ 31 A. Standard of Review

¶ 32 When an appeal is taken to the appellate court following entry of judgment by the trial court, on administrative review it is the decision of the administrative agency, not the judgment of the trial court, which is under consideration. *Harris v. Department of Human Services*, 345 Ill. App. 3d 764, 766, 803 N.E.2d 1063, 1065 (2004). "The scope of judicial review of administrative decisions 'extend[s] to all questions of law and fact presented by the entire record before the court.' " *McDonald v. Department of Human Services*, 406 Ill. App. 3d 792, 797, 952 N.E.2d 21, 26 (2010) (quoting 735 ILCS 5/3-110 (West 2008)). The question of whether it was the Departments' policy to accept partial returns of previously disallowed transfers presents a mixed question of law and fact. Similarly, whether Tjaden and Greer purchased an exempt prepaid burial contract is also a mixed question of law and fact. " 'A mixed question of law and fact asks the legal effect of a given set of facts.' " *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 379 Ill. App. 3d 22, 26, 883 N.E.2d 29, 33 (2007) (quoting *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143, 849 N.E.2d 349, 358 (2006)). This court will not reverse a decision on a mixed question of law and fact unless it is clearly erroneous. *Niles Township*, 379 Ill. App. 3d at 26, 883 N.E.2d at 33. A decision is clearly erroneous when we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department*

- 7 -

*of Employment Security*, 198 Ill. 2d 380, 393, 763 N.E.2d 272, 280-81 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 33                                     B. The Medicaid Act

¶ 34      In 1965, Congress enacted title XIX of the Social Security Act (42 U.S.C. §§ 1396 through 1396v (2006)), commonly known as the Medicaid Act. *Gillmore v. Illinois Department of Human Services*, 218 Ill. 2d 302, 304, 843 N.E.2d 336, 338 (2006). The statute created a cooperative program in which the federal government reimburses state governments for a portion of the costs to provide medical assistance to two low-income groups known as "the categorically needy" and "the medically needy." *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338. Medically needy persons, like Tjaden and Greer, are ineligible to receive cash grants because their resources exceed the eligibility threshold, but they still lack the ability to pay for medical assistance. *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338. Individuals falling into the medically needy category are called "MANG (Medical Assistance–No Grant) recipients." *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338 (citing 89 Ill. Adm. Code 120.10(a)). " 'To qualify for Medicaid as a MANG recipient, a person must have low income and low assets, and the person must "spend down" any resources over the statutory and regulatory limits.' " *Zander v. Adams*, 399 Ill. App. 3d 290, 294, 928 N.E.2d 492, 495 (2010) (quoting *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338, citing 89 Ill. Adm. Code 120.10(d)).

¶ 35      At its heart, Medicaid is a taxpayer-funded program intended to provide medical care to the truly poor and needy and not those who attempt to artificially impoverish themselves. See *McDonald*, 406 Ill. App. 3d at 793, 952 N.E.2d at 23. Indeed, various techniques are used by Medicaid applicants to exploit loopholes, including gifting assets to family members and executing financial transactions for which fair market value is not actually received. To this end, in 1993, Congress mandated states must "look back" into three- or five-year periods, depending on the asset, to determine whether that person made transfers solely to become eligible for Medicaid. *Gillmore*, 218 Ill. 2d at 306, 843 N.E.2d at 338-39 (citing 42 U.S.C. § 1396p(c)(1)(B) (2000)). "If the person disposed of assets for less than fair market value during the look-back period, the person is ineligible for medical assistance for a statutory penalty period based on the value of the assets transferred." *Gillmore*, 218 Ill. 2d at 306, 843 N.E.2d at 339 (citing 42 U.S.C. § 1396p(c)(1)(A) (2000)).

¶ 36                                     C. Penalty Calculation

¶ 37      Under the Medicaid Act, states are charged with imposing penalty periods of Medicaid noneligibility when an applicant "disposes of assets for less than fair market value" in connection with their request for benefits. 42 U.S.C. § 1396p(c)(1)(A) (2006). Section 1396p defines "assets" as including "all income and resources of the individual and of the individual's spouse, including any income or resources which the individual or such individual's spouse is entitled to but does not receive because of action." 42 U.S.C. § 1396p(h)(1) (2006). Thus, an asset transfer for less than fair market value would subject the applicant to mandatory penalties. 42 U.S.C. § 1396p(c) (2006). Accordingly, the

Illinois Public Aid Code (Code) (305 ILCS 5/5-2.1(a) (West 2008)) prohibits asset transfers of a medical-assistance applicant's interest for less than fair market value. Section 5-2.1(a) of the Code provides, in pertinent part, the following:

> "To the extent required under federal law, a person shall not make or have made a \*\*\* transfer of any legal or equitable interests in \*\*\* personal property \*\*\* for less than fair market value." 305 ILCS 5/5-2.1(a) (West 2008).

Section 120.387(f) of title 89 of the Illinois Administrative Code (Administrative Code) provides nonallowable transfers of assets incur penalty periods of ineligibility. 89 Ill. Adm. Code 120.387(f), as amended by 23 Ill. Reg. 11301 (eff. Aug. 27, 1999). These federal and state provisions are encapsulated in the Departments' Medical Policy Manual (Manual). It is comprised of a policy manual (PM), which describes the Medicaid laws and provides general guidance on Medicaid issues, and a Worker's Action Guide (WAG), which gives more specific guidance to agency caseworkers in determining eligibility and notifies them of common difficulties (*available at* http://www.dhs.state.il.us/page.aspx?item=12256).

¶ 38　　When the Departments determine an asset transfer is nonallowable, the applicant is subject to a penalty period for long-term-care services. The version of section 07-02-20-d of the Departments' Manual in effect at the time of the transfers in this case stated, in relevant part, the following:

> "Determine a separate penalty period for each month that a nonallowable transfer(s) is made. Each separate penalty period is equal to the number of months the uncompensated amount \*\*\* of assets transferred during a month meets the person's monthly (30-day) [long-term-care] costs at the private rate. There is no maximum penalty period." Medical Policy Manual, PM 07-02-20-d (eff. Apr. 17, 1998).

¶ 39　　To calculate penalty periods of noneligibility, the Departments' policy is to divide the amount of the nonallowable transfer by the monthly nursing home private pay rate, which is calculated by multiplying the daily pay rate by 30 days. Medical Policy Manual, WAG 07-02-20-d (July 1, 2012), *available at* http://www.dhs.state.il.us/page.aspx?Item=14993.

¶ 40　　　　　　　　　　　　　　D. Partial Gift Returns

¶ 41　　The Departments argue they correctly denied Tjaden and Greer credit for their children's partially returned gifts where the Manual did not provide for consideration of partial repayments of nonallowable transfers.

¶ 42　　Between March and August 2008, Greer wrote six checks to his son for $4,500 each. On August 29, 2008, Greer applied for Medicaid benefits. While his application was being processed, Greer's son wrote six checks back to Greer, each in the amount of $2,019. The memo on each check indicated the payment was intended as a partial return of the monthly $4,500 gifts made by Greer to his son in March, April, May, June, July, and August 2008. The private pay rate at Greer's nursing home was $3,330 per month. Greer sought to have the Departments partially reduce the value of his prior gifts, which he acknowledged were nonallowable transfers. If the Departments agreed, the value of the gifts to his son would have been reduced to less than the nursing home's $3,330 monthly private-pay rate. Greer argued he

would then be entitled to a "zero-penalty" for March, April, May, June, July, and August 2008 because the gifts he made to his son were actually less than the private-pay rate ($4,500 minus $2,019 equals $2,481, which if divided by Greer's $3,330 private-pay rate, equals .75 and results in a zero-month penalty). According to Greer, the Departments had processed Medicaid applications this way "for a decade."

¶ 43 In May 2009, Tjaden made a $4,202.79 gift to her son. On June 5, 2009, she applied for Medicaid assistance. In July 2009, while her application was being processed, Tjaden's son returned $100 to her. The private-pay rate at Tjaden's nursing home was $4,140 per month. Like Greer, Tjaden sought to have the Departments partially reduce the value of the prior gift. We note, both Tjaden and Greer used the same financial planner. If the Departments agreed, the value of the gift to her son would have been reduced to less than her nursing home's $4,140 monthly private-pay rate, resulting in a zero-month penalty for May 2009 ($4,202.79 minus $100 equals $4,102.79, which if divided by Tjaden's $4,140 private pay rate, equals .99 and results in a zero-month penalty). Tjaden argued the Departments had processed Medicaid applications consistently this way for the last 10 years. The Departments denied Greer's and Tjaden's requests on the grounds the Manual does not provide for consideration of partial repayments of nonallowable transfers.

¶ 44 Section 1396p(c)(2)(C) of the Medicaid Act provides the following with regard to the return of assets previously transferred for less than fair market value:

> "An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that[:]
>
> * * *
>
> (C) a satisfactory showing is made to the State (in accordance with regulations promulgated by the Secretary [of the Federal Department of Health and Human Services]) that *** (iii) *all* assets transferred for less than fair market value have been returned to the individual[.]" (Emphasis added.) 42 U.S.C. § 1396p(c)(2)(C) (2006).

¶ 45 The parties agree federal law does not *require* states to accept partial returns for credit. Indeed, federal law leaves it to individual states to decide whether to accept partial returns. The regulations promulgated by the Secretary of the federal Department of Health and Human Services are contained in the State Medicaid Manual, which provides guidance to the states in administering their Medicaid programs. See State Medicaid Manual, Health Care Financing Administration Publication No. 45-3, Transmittal 64 (Nov. 1994); *Gillmore*, 218 Ill. 2d at 306-07, 843 N.E.2d at 339. Where states have decided to recognize partial returns, section 3258.10 of the State Medicaid Manual provides, in a section entitled "Exceptions to Application of Transfer of Assets Penalties," the following:

> "C. In addition to the above, a penalty for transferring an asset for less than fair market value is not assessed if a satisfactory showing is made to the State that:
>
> * * *
>
> 3. <u>All Assets Transferred for Less Than Fair Market Value Are Returned to the Individual</u>.–When all assets transferred are returned to the individual, no penalty for

transferring assets can be assessed. In this situation, you must ensure that any benefits due on behalf of the individual are, in fact, paid. ***

\*\*\*

It is important to note that, to void imposition of a penalty, *all* of the assets in question or their fair market equivalent must be returned. ***

When only part of an asset or its equivalent value is returned, a penalty period can be modified but not eliminated. For example, if only half the value of the asset is returned, the penalty period can be reduced by one-half." State Medicaid Manual, Health Care Financing Administration Publication No. 45-3, Transmittal 64, § 3258.10 (Nov. 1994).

Thus, if a state does accept partial returns, it may prorate but not eliminate the penalty. It is worth noting, here, Tjaden and Greer argue for a "zero-month penalty," *i.e.*, no penalty.

¶ 46 The parties also agree at the time of the applications in these cases, the Code and the Administrative Code were both silent as to whether to accept partial returns for credit. (The Administrative Code was amended effective January 1, 2012, to specifically provide for partial returns. It applies to applications made after January 1, 2012. See 89 Ill. Adm. Code 120.388(m)(6)(A), added at 35 Ill. Reg. 18645 (eff. Jan. 1, 2012).) The Departments argue the Manual also did not provide for partial returns. However, Tjaden and Greer argue language contained in the Manual shows it was in fact always the Departments' policy to accept such returns. In making their argument, Tjaden and Greer point to a "Note" to caseworkers contained in the Manual. The version of the Manual in effect at the time of Tjaden's and Greer's applications provided the following:

"Determine a separate penalty period for each month that a nonallowable transfer(s) is made. Each penalty period is equal to the number of months the uncompensated amount (see NOTE) of assets transferred during a month meets the person's monthly (30-day) [long-term-care] costs at the private rate.

\* \* \*

NOTE: The uncompensated amount is the fair market value of each transferred asset, minus any *value received for the asset*. The total uncompensated amount for each month is equal to the sum of the uncompensated amounts for each nonallowable transfer made in a month." (Emphasis added.) Medical Policy Manual, PM 07-02-20-d (eff. Apr. 17, 1998).

¶ 47 However, the Departments argue section 07-02-20-d was not written to address the partial-gift-return situation presented in this case. According to the Departments, section 07-02-20-d is not a "gift back" provision at all and has no application where the applicant and the grantee are transferring assets back and forth to qualify for Medicaid benefits. Instead, the Departments contend this section pertains to uncompensated transferred assets where an applicant has made a partial gift and partial sale of an asset. The Departments explain section 07-02-20-d is only relevant where an applicant transfers an asset for partial value, *i.e.*, sells a house worth $150,000 to her son for $50,000. In that example, the Departments would recognize $50,000 was transferred for the value of the house. The uncompensated amount *at*

*the time of the transfer* would be $100,000. The Departments point out in this case no underlying transaction existed where value was given in return for the transferred gift.

¶ 48 Tjaden and Greer argue the language in the caseworker note shows it was the Departments' policy to recognize partial returns for credit. Tjaden and Greer maintain the phrase "any value" shows the Departments' policy was to accept partial returns. Thus, Greer contends he received value of $2,019 from his son for his $4,102 transfer. Tjaden likewise maintains she received value of $100 from her son for her $4,102.79 transfer. However, even if we were to accept Tjaden's and Greer's argument "any value" is sufficient, the Manual's additional use of the term "received" implies value exchanged at the time of, and in consideration for, the transfer. We cannot say Tjaden and Greer "received" any value *at the time* of their transfers. Instead, checks were written "back" to Tjaden and Greer at a time after the gifts were made (July 2008 for the May 2008 gift in Tjaden's case and September 2008 for the March through August 2008 gifts in Greer's case). Thus, no *transactions* took place wherein value was given in return for the transferred gifts. The Departments did not err in denying Tjaden and Greer credit for the partial returns. Further, we note the most likely explanation for the partial transfer back of the gifts was to make the recipient eligible for Medicaid–something expressly not permitted. See Medical Policy Manual, PM 07-02-20-b (July 1, 2012), *available at* http://www.dhs.state.il.us/page.aspx?Item=14987 (allowable transfers include "[t]ransfers made exclusively for a reason *other than* to qualify for benefits" (emphasis in original)).

¶ 49 As a result, the Departments did not err in imposing penalty periods on Tjaden and Greer for their nonallowable cash transfers. Accordingly, the trial courts' rulings on this issue in case Nos. 4-12-1087 and 4-12-0918 are reversed.

¶ 50                              E. Life Insurance Purchases

¶ 51 The Departments argue they properly characterized Tjaden's and Greer's $12,000 life insurance purchases as nonexempt where no burial contracts existed and no showing was made they received fair market value for the purchases. We agree.

¶ 52 The version of section 3-1.2 of the Code in effect at the time of Tjaden's and Greer's applications provided the following:

> "In determining the resources of an individual or any dependents, the Department shall exclude from consideration the value of funeral and burial spaces, grave markers and other funeral and burial merchandise, funeral and burial insurance the proceeds of *which can only be used to pay* the funeral and burial expenses of the insured and funds specifically set aside for the funeral and burial arrangements of the individual or his or her dependents, including prepaid funeral and burial plans, *to the same extent that such items are excluded from consideration* under the federal Supplemental Security Income program." (Emphases added.) 305 ILCS 5/3-1.2 (West 2008).

The Supplemental Security Income program defines a life insurance funded burial contract as follows:

> "A life insurance funded burial contract involves an individual purchasing a life insurance policy on his or her own life and then assigning, revocably or irrevocably,

either the proceeds or ownership of the policy to a third party, generally a funeral provider. The purpose of the assignment is to fund a burial contract." SI 01130.425 (eff. May 20, 1992), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0501130 425.

¶ 53        Section 07-02-08 of the Departments' Manual, entitled "Burial Funds," provides the following:

"Certain amounts set aside as a burial fund to cover the funeral and burial expenses of a client and/or their spouse are exempt. In order to be exempt, the money set aside must be separate and identifiable as a fund to cover funeral and burial expenses.

When a client prepays funeral and burial expenses to a funeral home, the funeral home provides the client with a prepaid burial agreement or contract. The money paid by the client to fund the contract can be held by the funeral home in a trust account or can be used to purchase a life insurance policy on the life of the client. The prepaid burial contract is funded by trust or by life insurance.

The amount that is exempt depends on whether the burial fund is:

• money in a bank account set aside for funeral and burial expenses [(up to $1,500 per PM 07-02-08-a)]; or
• a revocable prepaid burial contract with a funeral home, funded by a trust account; or
• an irrevocable prepaid burial contract with a funeral home, funded by a trust account; or
• a prepaid burial contract with a funeral home, funded by a life insurance policy." Medical Policy Manual, PM 07-02-08 (Sept. 1, 1998).

¶ 54        The version of section 07-02-08-d of the Departments' Manual, entitled "Prepaid Burial Contract Funded by Life Insurance," in effect at the time of Tjaden's and Greer's applications, and upon which the parties rely, provided the following:

"*Disregard a prepaid burial contract funded by a life insurance policy* when ownership of the insurance policy has been irrevocably assigned. With the irrevocable assignment of ownership of the insurance policy, the asset no longer belongs to the client.

*When a life insurance policy funds a prepaid burial contract*, the life insurance policy is purchased at the time the prepaid burial arrangement is made. The funeral home, acting as an agent of the insurance company, sells the client the life insurance policy. The client assigns ownership of the life insurance policy to a third party. The third party may be a trust within the insurance company. The party accepting the assignment of the life insurance policy is responsible for ensuring that the funeral home receives the proceeds of the insurance policy when they provide the funeral goods and services selected by the client.

The assignment represents the transfer of an asset. If the client resides in [a long-term-care facility] *** determine if fair market value was received. *If the total value of funeral goods and services to be received at [the] time of death is comparable*

- 13 -

*to the face value of the life insurance policy, [then] fair market value was received*." (Emphases added.) Medical Policy Manual, PM 07-02-08-d (Sept. 1, 1998).

¶ 55 Tjaden and Greer argue their $12,000 purchases were allowable because the value of services they would receive at death was "comparable" to the value of the insurance policies. Tjaden and Greer maintain, therefore, the purchases were for fair market value and thus no penalties should have been assessed. However, their argument ignores the fact that in both cases no burial contracts existed. While not specifically defined by the Departments' Manual, the social security operations manual defines a "prepaid burial contract" as follows: "A prepaid (or preneed) burial contract is an agreement whereby the buyer pays in advance for a burial that the seller agrees to furnish upon the death of the buyer or other designated individual." SI 01130.420 (eff. Dec. 4, 2012), *available at* https://secure.ssa.gov/apps10/pom s.nsf/lnx/0501130420.

¶ 56 In this case, Tjaden and Greer both concede they did not contract for funeral or burial service. In fact, they argue such a contract was unnecessary. According to their argument, the Departments' Manual provides only that the value of the insurance policy has to be "comparable" to the value of the funeral and burial services received, which they claim the funeral home estimates show. However, in context, the "comparable" standard refers back to language in the preceding paragraph regarding funds paid pursuant to a prepaid burial *contract*. Tjaden and Greer concede they presented only estimates for burial expenses to the Departments, not contracts for services. Absent contracts, no comparisons can be made.

¶ 57 In addition, the Code recognizes the existence of a burial contract where the funds can *only* be used to pay the funeral expenses, which is not the case here. Instead, the terms of both trusts condition payment on the presentation of a bill for services within 45 days of death. If no such bill is presented within 45 days, or if a bill for less than $12,000 was presented, then the trust proceeds, or remaining proceeds, go to their children. Under Tjaden's and Greer's theory, the funds in the trusts would have been considered exempt for Medicaid eligibility purposes but could pass to their children. Thus, at the time their trusts were created, the potential existed for the full amount of the funds to be diverted from paying funeral expenses. Accordingly, the Departments did not err in determining the $12,000 life insurance purchases were nonallowable transfers.

¶ 58 In sum, while Tjaden and Greer argued the Departments' Manual requires only the funds have to be "comparable," a contract must have existed in the first place, which is not the case here. Further, the Code provides the funds can only be used to pay funeral expenses, also not the case here, because the structure of the trusts could allow the funds to pass to the applicants' children instead of paying funeral expenses. Thus, the Departments did not err in imposing penalty periods on Tjaden and Greer for their respective nonexempt insurance purchases. Accordingly, the circuit courts' rulings on this issue in case Nos. 4-12-0768 and 4-12-0918 are reversed.

¶ 59                              III. CONCLUSION

¶ 60          For the foregoing reasons, we reverse the circuit courts' rulings and affirm the
Departments' administrative decisions in case Nos. 4-12-0768, 4-12-0918, and 4-12-1087.


¶ 61          No. 4-12-0768, Reversed.

¶ 62          No. 4-12-0918, Reversed.

¶ 63          No. 4-12-1087, Reversed.