# Illinois Official Reports

## Appellate Court

*Evans v. State of Illinois*, 2013 IL App (4th) 121082

| | |
|---|---|
| Appellate Court Caption | PEGGY J. EVANS, By and Through Joanne Durbin, Her Agent, Plaintiff-Appellant, v. THE STATE OF ILLINOIS, Acting Through THE DEPARTMENT OF HUMAN SERVICES and MICHELLE R.B. SADDLER, Its Secretary; and THE DEPARTMENT OF HEALTHCARE AND FAMILY SERVICES and JULIE HAMOS, Its Director, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-12-1082 |
| Filed<br>Rehearing denied | December 24, 2013<br>January, 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action challenging the four-month penalty period of Medicaid noneligibility imposed on plaintiff based on her purchase of a life insurance policy and her transfer of $4,000 to one of her daughters, the decisions of the Department of Human Services and the Department of Healthcare and Family Services were upheld, despite plaintiff's contentions that the Departments did not follow the "long-standing policy" of using the private-pay rate at the long-term healthcare facility the applicant was in at the time of the decision but, rather, used the rate in effect at the time of her application for Medicaid assistance in making the decision, and that the insurance policy was assigned for burial expenses and was exempt, since federal law explicitly provides that the pay rate at the time of the application should be used and plaintiff did not have a contract for her burial expenses, in that the funds in the trust plaintiff created for the life insurance allowed the funds to pass to her children rather than going to burial expenses. |

| Decision Under Review | Appeal from the Circuit Court of Sangamon County, No. 10-MR-502; the Hon. John W. Belz, Judge, presiding. |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | Duane D. Young (argued), of LaBarre, Young & Behnke, of Springfield, for appellant. |
| | Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Carl J. Elitz (argued), Assistant Attorney General, of counsel), for appellees. |
| Panel | JUSTICE POPE delivered the judgment of the court, with opinion. Justices Knecht and Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1    In December 2008, defendants, the Department of Healthcare and Family Services (HFS) and the Department of Human Services (DHS) (collectively, the Departments) granted plaintiff, Peggy J. Evans', application for Medicaid assistance but imposed penalty periods of noneligibility, citing certain nonallowable asset transfers.

¶ 2    Evans sought administrative review, and the circuit court affirmed. Evans appeals, arguing the Departments erred in (1) using Evans' long-term-care private-pay rate as of the date of her Medicaid application in calculating a one-month penalty period and (2) imposing a three-month penalty period where she created an exempt burial contract. We affirm.

¶ 3                               I. BACKGROUND

¶ 4    On April 3, 2008, Evans, a resident of a long-term health care facility, filed for Medicaid assistance. At the time of her application, the private-pay rate at the facility was $120 per day ($3,600 per month).

¶ 5    On August 25, 2008, Evans purchased a life insurance policy from Funeral Director's Life Insurance Company for $12,000. That same day, the proceeds of the policy were assigned to create an irrevocable trust. The trust named plaintiff's three children, including her daughter, Joanne Durbin, Evans' power of attorney, as the residual beneficiaries. The terms of the trust are not in dispute. Article 9 of the trust requires the trustee to pay the funeral and burial expenses incurred provided evidence of those expenses is presented to the trustee within 45

days of Evans' death. Under the terms of the trust, the trustee may not pay any expenses after 45 days of Evans' death. Article 4, paragraph B, of the trust provides "any remaining assets shall be distributed to the residual beneficiary," *i.e.*, Evans' children.

¶ 6 On August 28, 2008, a $4,000 check was written on Evans' checking account to Joanne.

¶ 7 On December 14, 2008, the Departments approved Evans' application but determined she was ineligible for Medicaid funding for a four-month period. She was assessed a one-month penalty for the $4,000 transfer to Joanne as well as an additional three-month penalty for the $12,000 insurance purchase. The penalty period ran from August 1, 2008, through November 30, 2008.

¶ 8 Evans appealed, and an administrative hearing was held on November 13, 2009. During the hearing, Evans acknowledged the $4,000 check was a nonallowable transfer. However, Evans argued the penalty period should have been calculated using the private-pay rate for her care as of the date of the Departments' decision instead of the rate as of the date of her application. By the time her application was approved, the private-pay rate had increased from $120 per day ($3,600 per month) to $135 per day ($4,050 per month). Using the $135-per-day figure, Evans contended no penalty should be assessed because the $4,000 transfer was less than the $4,050 private-pay rate ($4,000 divided by $4,050 yields 0.99 and results in a zero-month penalty). The Departments calculated the one-month penalty using the $3,600 figure as follows: $4,000 divided by Evans' $3,600 private pay rate equals 1.1, which results in a one-month penalty. Evans argued the decision date had been used by the Departments "for the last 30 years."

¶ 9 Evans also argued the $12,000 life insurance purchase was exempt from any penalty because its proceeds were assigned to an irrevocable trust to pay an estimated $12,000 in funeral and burial expenses. Evans presented an estimate for anticipated funeral and burial costs by a local funeral home in the amount of $12,136.48. However, Evans conceded she did not enter into any contracts regarding those services. Evans argued she did not contract with the funeral home because she wanted her family to have the flexibility to purchase services from other providers. Evans argued these "exact" types of contracts have been permitted in "many other cases." The trust in this case provided for payment of funeral expenses so long as a bill was presented to the trustee within 45 days of death.

¶ 10 On July 12, 2010, the Departments issued their joint final administrative decision upholding the four-month penalty period. Specifically, the Departments found the following:

> "The record of the hearing shows that on August 28, 2008, $4,000.00 was transferred from [Evans'] checking account. At [the] hearing, all parties agreed that this was a non-allowable transfer. However, the imposition of a one month penalty period remains at issue. The private pay rate at the long term care facility was $120.00 per day, or $3,600 per month at the time of [Evans'] application in April 2008. By the decision date of December 14, 2008, the private pay rate was $135.00 per day, or $4,050.00 per month. The Department's Policy Manual offers no specific guidance in this matter. However, the Department's argument that federal statute applies is compelling. The federal code cited above [(42 U.S.C. § 1396p(c)(1)(E)(i))] is quite clear, and the decision to utilize a private pay rate of $3,600.00 per month was,

therefore, appropriate. Based on a non-allowable asset transfer of $4,000, the local office correctly imposed a one month penalty.

Regarding the transfer of $12,000, as cited above, the purchase of a life insurance policy, and assignment to an irrevocable trust represents the transfer of an asset. Such transfer is allowable if the total value of funeral goods and services to be received at [the] time of death is comparable to the face value of the life insurance policy, *i.e.*, fair market value is received. In this case, [Evans] purchased a policy with a provider allowing for payment of funeral/burial expenses to the provider of choice. In the absence of a contract with a specific provider, only an estimate of funeral/burial expenses was provided. The beneficiary, as noted on the Application for Life Insurance or Annuity, was the irrevocable trust agreement. This policy was then assigned to the referenced irrevocable trust. While the trust agreement specifies that upon [Evans'] death payment is to be made for all allowable funeral/burial expenses, as indicated on Exhibit B of the trust agreement, there is no assurance that the full $12,000.00 will, in fact, be utilized for such expenses. In fact, Article 4, Part B of the trust agreement specifies that 'any remaining assets shall be distributed to the residual beneficiary.' The residual beneficiaries are [Evans'] children. There is no inference that at the time of [Evans'] death the proceeds of the trust will not be used in total for payment of funeral/burial expenses. Nevertheless, in the absence of a burial contract, no such guarantee exists and the actual fair market value of the transaction cannot be determined. The local office acted correctly, therefore, in considering the transaction as a non-allowable transfer resulting in an additional three month penalty period."

¶ 11    On August 13, 2010, Evans filed a complaint in the circuit court seeking administrative review of the Departments' decision.

¶ 12    On November 8, 2012, the circuit court affirmed the Departments' decision to impose the four-month penalty period.

¶ 13    This appeal followed

¶ 14                                II. ANALYSIS

¶ 15    On appeal, Evans argues the Departments erred in imposing a four-month penalty period of Medicaid noneligibility. Specifically, Evans contends the (1) Departments should have used Evans' long-term-care private-pay rate on the date of the Departments' decision rather than the Medicaid application date in calculating the one-month penalty and (2) three-month penalty was improper where the $12,000 life insurance purchase resulted in an exempt burial contract.

¶ 16                            A. Standard of Review

¶ 17    When an appeal is taken to the appellate court following entry of judgment by the trial court on administrative review, it is the decision of the administrative agency, not the judgment of the trial court, which is under consideration. *Harris v. Department of Human Services*, 345 Ill. App. 3d 764, 766, 803 N.E.2d 1063, 1065 (2004). "The scope of judicial review of administrative decisions 'extend[s] to all questions of law and fact presented by the entire

- 4 -

record before the court.' " *McDonald v. Department of Human Services*, 406 Ill. App. 3d 792, 797, 952 N.E.2d 21, 26 (2010) (quoting 735 ILCS 5/3-110 (West 2008)). The question of whether the Departments should have used the application date or the decision date in calculating the penalty period presents a question of law. However, even where review is *de novo*, Departments' interpretation of their own rules and regulations " 'enjoys a presumption of validity.' " *Montalbano v. Department of Children & Family Services*, 343 Ill. App. 3d 471, 479, 797 N.E.2d 1078, 1084 (2003) (quoting *Nolan v. Hillard*, 309 Ill. App. 3d 129, 143, 722 N.E.2d 736, 747 (1999)). "Courts accord such deference in recognition of the fact that agencies make informed judgments on the issues based upon their experience and expertise ***." *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 387 n.9, 925 N.E.2d 1131, 1143 n.9 (2010) (citing *Metropolitan Water Reclamation District of Greater Chicago v. Department of Revenue*, 313 Ill. App. 3d 469, 474-75, 729 N.E.2d 924, 929 (2000)).

¶ 18    Whether Evans purchased an exempt prepaid burial contract is a mixed question of law and fact. " 'A mixed question of law and fact asks the legal effect of a given set of facts.' " *Niles Township High School District 219 v. Illinois Educational Labor Relations Board*, 379 Ill. App. 3d 22, 26, 883 N.E.2d 29, 33 (2007) (quoting *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143, 849 N.E.2d 349, 358 (2006)). This court will not reverse a decision on a mixed question of law and fact unless it is clearly erroneous. *Niles Township*, 379 Ill. App. 3d at 26, 883 N.E.2d at 33. A decision is clearly erroneous when we are " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393, 763 N.E.2d 272, 280-81 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 19                                B. The Medicaid Act

¶ 20    In 1965, Congress enacted Title XIX of the Social Security Act (42 U.S.C. §§ 1396 through 1396v (2006)), commonly known as the Medicaid Act. *Gillmore v. Illinois Department of Human Services*, 218 Ill. 2d 302, 304, 843 N.E.2d 336, 338 (2006). The statute created a cooperative program in which the federal government reimburses state governments for a portion of the costs to provide medical assistance to two low-income groups known as "the categorically needy" and "the medically needy." *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338. Medically needy persons, like Evans, are ineligible to receive cash grants because their resources exceed the eligibility threshold, but they still lack the ability to pay for medical assistance. *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338. Individuals falling into the medically needy category are called "MANG (Medical Assistance–No Grant) recipients." *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338 (citing 89 Ill. Adm. Code 120.10(a)). " 'To qualify for Medicaid as a MANG recipient, a person must have low income and low assets, and the person must "spend down" any resources over the statutory and regulatory limits.' " *Zander v. Adams*, 399 Ill. App. 3d 290, 294, 928 N.E.2d 492, 495 (2010) (quoting *Gillmore*, 218 Ill. 2d at 305, 843 N.E.2d at 338, citing 89 Ill. Adm. Code 120.10(d)).

¶ 21    In 1993, Congress mandated states must "look back" into three- or five-year periods, depending on the asset, to determine whether that person made transfers solely to become

eligible for Medicaid. *Gillmore*, 218 Ill. 2d at 306, 843 N.E.2d at 338-39 (citing 42 U.S.C. § 1396p(c)(1)(B) (2000)). "If the person disposed of assets for less than fair market value during the look-back period, the person is ineligible for medical assistance for a statutory penalty period based on the value of the assets transferred." *Gillmore*, 218 Ill. 2d at 306, 843 N.E.2d at 339 (citing 42 U.S.C. § 1396p(c)(1)(A) (2000)).

¶ 22                                    C. Penalty Calculation

¶ 23    Under the Medicaid Act, states are charged with imposing penalty periods of Medicaid noneligibility when an applicant "disposes of assets for less than fair market value" in connection with their request for benefits. 42 U.S.C. § 1396p(c)(1)(A) (2006). Section 1396p defines "assets" as including "all income and resources of the individual and of the individual's spouse, including any income or resources which the individual or such individual's spouse is entitled to but does not receive because of action." 42 U.S.C. § 1396p(h)(1) (2006). Thus, an asset transfer for less than fair market value would subject the applicant to mandatory penalties. 42 U.S.C. § 1396p(c) (2006). Accordingly, the Illinois Public Aid Code (Code) prohibits asset transfers of a medical-assistance applicant's interest for less than fair market value. Section 5-2.1(a) of the Code provides, in pertinent part, the following:

> "To the extent required under federal law, a person shall not make or have made a *** transfer of any legal or equitable interests in *** personal property *** for less than fair market value." 305 ILCS 5/5-2.1(a) (West 2008).

Section 120.387(f) of title 89 of the Illinois Administrative Code (Administrative Code) provides nonallowable transfers of assets incur penalty periods of ineligibility. 89 Ill. Adm. Code 120.387(f), amended at 23 Ill. Reg. 11301 (eff. Aug. 27, 1999). These federal and state provisions are encapsulated in the Departments' Medical Policy Manual (Manual). It is comprised of a policy manual (PM), which describes the Medicaid laws and provides general guidance on Medicaid issues, and a Worker's Action Guide (WAG), which gives more specific guidance to agency caseworkers in determining eligibility and notifies them of common difficulties (*available at* http://www.dhs.state.il.us/page.aspx?item=12256).

¶ 24    When the Departments determine an asset transfer is nonallowable, the applicant is subject to a penalty period for long-term-care services. The version of section 07-02-20-d of the Departments' Manual in effect at the time of the $4,000 transfer stated, in relevant part, the following:

> "Determine a separate penalty period for each month that a nonallowable transfer(s) is made. Each separate penalty period is equal to the number of months the uncompensated amount *** of assets transferred during a month meets the person's monthly (30-day) [long-term-care] costs at the private rate. There is no maximum penalty period." Medical Policy Manual, PM 07-02-20-d (eff. Apr. 17, 1998).

¶ 25    In this case, Evans concedes the $4,000 check to her daughter was a nonallowable transfer of assets. The parties agree the only issue is whether the Departments erred in calculating the corresponding penalty period. Evans argues the Departments erred in using her Medicaid

- 6 -

application date instead of the date of the Departments' decision on her application when determining the correct divisor to use in calculating the penalty period for the $4,000 transfer.

¶ 26 To calculate penalty periods of noneligibility, the Departments' policy is to divide the amount of the nonallowable transfer by the monthly nursing home private-pay rate, which is calculated by multiplying the daily pay rate by 30 days. Medical Policy Manual, WAG 07-02-20-d (July 1, 2012), *available at* http://www.dhs.state.il.us/page.aspx?Item=14993. According to Evans, the penalty period should be calculated using the pay rate for her care as of the date of the Departments' decision instead of the rate as of her application date. By the decision date, her pay rate had increased from $120 per day ($3,600 per month) to $135 per day ($4,050 per month). The Departments divided the $4,000 transfer by Evans' $3,600 pay rate. The resulting 1.1 figure corresponds to a one-month penalty. Evans argues the Departments should have instead used the $135-per-day decision-date figure in calculating the penalty. In that case, Evans contends no penalty would have been assessed because the $4,000 transfer was less than the $4,050 private-pay rate ($4,000 divided by $4,050 yields 0.99 and results in a zero-month penalty).

¶ 27 However, as the Departments observe, the Manual does not instruct which date to use. Evans agrees the Manual, Code, and Administrative Code "are all silent as to which date to use." Evans argues her witness (her financial representative) at the administrative hearing testified the Departments' "long-standing policy" was to use the pay rate as of the date of the Departments' decision. The Departments argue insufficient evidence was presented to show such a policy existed. We agree with the Departments in this regard.

¶ 28 At the administrative hearing, Joseph Oettel testified on Evans' behalf the Departments have used the decision date "for the last 30 years." However, Oettel was not an employee of the Departments. In fact, Oettel worked for Lighthouse Financial and Consulting Services, LLC, had been Evans' financial representative, and actually represented Evans during the hearing. Evans did not present testimony from any of the Departments' employees regarding which date to use. Jo Ingrum, a public service administrator with the Departments' office of the inspector general, testified Oettel's statements regarding the use of the decision date were incorrect. Ingrum instead testified the Departments have used the application date in calculating the penalty. We note Evans did not present any additional evidence regarding the Departments' past practices and our review of the record does not reveal any other evidence to support Oettel's testimony.

¶ 29 While the Manual is silent regarding which date to use, the Departments correctly point out the Medicaid Act instructs the Departments to use the application date in calculating a penalty period. See *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37 (1981) (state Medicaid requirements must be consistent with federal guidelines). Specifically, section 1396p(c)(1)(E)(i) of the Medicaid Act provides the following:

> "With respect to an institutionalized individual, the number of months of ineligibility under this subparagraph for an individual shall be equal to–
>
>> (I) the total, cumulative uncompensated value of all assets transferred by the individual (or individual's spouse) on or after the look-back date specified in subparagraph (B)(i), *divided by*

(II) *the average monthly cost* to a private patient of nursing facility services in the State (or, at the option of the State, in the community in which the individual is institutionalized) *at the time of application*." (Emphases added.) 42 U.S.C. § 1396p(c)(1)(E)(i) (2006).

¶ 30 Thus, federal law makes clear the divisor is determined by the pay rate at the time of application. While Evans acknowledges the federal statute provides the application date is to be used, she maintains the decision date should still be used. However, the federal statute is explicit and supports the Departments' position as well as the administrative decision. Thus, the Departments did not err in using Evans' application date to calculate a one-month penalty period for the nonallowable transfer of $4,000 to her daughter.

¶ 31           D. Life Insurance Purchase

¶ 32 Evans argues the Departments erred in imposing a three-month penalty period where they failed to characterize the $12,000 life insurance purchase and trust as an exempt "burial contract." According to Evans, it was an allowable purchase because the value of services to be received at the time of death was comparable to the value of the insurance policy. Evans maintains, therefore, the purchase was for fair market value and a penalty should not have been assessed. We disagree.

¶ 33 The version of section 3-1.2 of the Code in effect at the time of Evans' application provided the following:

> "In determining the resources of an individual or any dependents, the Department shall exclude from consideration the value of funeral and burial spaces, grave markers and other funeral and burial merchandise, funeral and burial insurance the proceeds of *which can only be used to pay* the funeral and burial expenses of the insured and funds specifically set aside for the funeral and burial arrangements of the individual or his or her dependents, including prepaid funeral and burial plans, *to the same extent that such items are excluded from consideration* under the federal Supplemental Security Income program." (Emphases added.) 305 ILCS 5/3-1.2 (West 2008).

The Supplemental Security Income program defines a life insurance funded burial contract as follows:

> "A life insurance funded burial contract involves an individual purchasing a life insurance policy on his or her own life and then assigning, revocably or irrevocably, either the proceeds or ownership of the policy to a third party, generally a funeral provider. The purpose of the assignment is to fund a burial contract." SI 01130.42 (eff. May 20, 1992), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0501130425.

¶ 34 Section 07-02-08 of the Departments' Manual, entitled "Burial Funds," provides the following:

> "Certain amounts set aside as a burial fund to cover the funeral and burial expenses of a client and/or their spouse are exempt. In order to be exempt, the money set aside must be separate and identifiable as a fund to cover funeral and burial expenses.

When a client prepays funeral and burial expenses to a funeral home, the funeral home provides the client with a prepaid burial agreement or contract. The money paid by the client to fund the contract can be held by the funeral home in a trust account or can be used to purchase a life insurance policy on the life of the client. The prepaid burial contract is funded by trust or by life insurance.

The amount that is exempt depends on whether the burial fund is:

• money in a bank account set aside for funeral and burial expenses [(up to $1,500 per PM 07-02-08-a)]; or

• a revocable prepaid burial contract with a funeral home, funded by a trust account; or

• an irrevocable prepaid burial contract with a funeral home, funded by a trust account; or

• a prepaid burial contract with a funeral home, funded by a life insurance policy." Medical Policy Manual, PM 07-02-08 (Sept. 1, 1998).

¶ 35    Here, Evans created an irrevocable trust funded by a life insurance policy. The version of section 07-02-08-d of the Departments' Manual, entitled "Prepaid Burial Contract Funded by Life Insurance," in effect at the time of Evans' application, and upon which both parties rely, provided the following:

"*Disregard a prepaid burial contract funded by a life insurance policy* when ownership of the insurance policy has been irrevocably assigned. With the irrevocable assignment of ownership of the insurance policy, the asset no longer belongs to the client.

*When a life insurance policy funds a prepaid burial contract*, the life insurance policy is purchased at the time the prepaid burial arrangement is made. The funeral home, acting as an agent of the insurance company, sells the client the life insurance policy. The client assigns ownership of the life insurance policy to a third party. The third party may be a trust within the insurance company. The party accepting the assignment of the life insurance policy is responsible for ensuring that the funeral home receives the proceeds of the insurance policy when they provide the funeral goods and services selected by the client.

The assignment represents the transfer of an asset. If the client resides in [a long-term-care facility] *** determine if fair market value was received. *If the total value of funeral goods and services to be received at [the] time of death is comparable to the face value of the life insurance policy, [then] fair market value was received.*" (Emphases added.) Medical Policy Manual, PM 07-02-08-d (Sept. 1, 1998).

¶ 36    According to Evans, the $12,000 purchase was allowable because the value of services to be received at the time of death were "comparable" to the value of the insurance policy. Evans maintains, therefore, the purchase was for fair market value and a penalty should not have been assessed. However, her argument ignores the fact there was no burial contract in this case. While not specifically defined by the Departments' Manual, the social security operations manual defines a "prepaid burial contract" as follows: "A prepaid (or preneed) burial contract

- 9 -

is an agreement whereby the buyer *pays in advance* for a burial that the seller agrees to furnish upon the death of the buyer or other designated individual." (Emphasis added.) SI 01130.420 (eff. Dec. 4, 2012), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0501130420.

¶ 37    In this case, however, Evans not only concedes she did not contract for any funeral or burial services, she insists no such contract is necessary. We are not persuaded. Evans argues the Manual states the value of the insurance policy just has to be "comparable" to the value of the funeral and burial services received. However, in context, the "comparable" standard refers back to language in the preceding paragraph regarding funds paid pursuant to a prepaid burial *contract*. Evans concedes she presented only an estimate for burial expenses to the Departments, not a contract for services. That estimate is contained in the record on appeal. Without a contract, no comparison can even be made.

¶ 38    In addition, the Code recognizes the existence of a burial contract where the funds can *only* be used to pay the funeral expenses, which is not the case here. Instead, here, the terms of the trust state payment is conditioned on the trustee being presented a bill for services within 45 days of Evans' death. If no such bill is presented within 45 days, or if a bill for less than $12,000 was presented, then the trust proceeds, or remaining proceeds, go to Evans' children. The funds in the trust, which, under Evans' theory, would have been considered exempt for Medicaid eligibility purposes, would pass to Evans' children. Thus, at the time the trust was created, the potential existed for the full amount of the funds to be diverted from paying funeral expenses. Accordingly, the Departments did not err in considering the $12,000 life insurance purchase to be a nonallowable transfer.

¶ 39    In sum, while Evans argues the Manual requires the funds only have to be "comparable," a contract must have existed in the first place, which is not the case here. Further, the Code provides the funds can only be used to pay funeral expenses, also not the case here, as the structure of the trust could allow the funds to pass to Evans' children instead of paying funeral expenses. Accordingly, the Departments did not err in imposing a three-month penalty period.

¶ 40                                   III. CONCLUSION

¶ 41    For the foregoing reasons, we affirm the circuit court's affirmance of the Departments' administrative decision.

¶ 42    Affirmed.